```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                              15 Cr. 565 (VEC)

KEVIN JOHNSON,

                Defendant.

------------------------------x
                                            New York, N.Y.
                                            April 28, 2016
                                            2:45 p.m.


Before:

                   HON. VALERIE E. CAPRONI,

                                            District Judge


                         APPEARANCES

PREET BHARARA
     United States Attorney for the
     Southern District of New York
JASON SWERGOLD
     Assistant United States Attorney

FEDERAL DEFENDERS OF NEW YORK
     Attorneys for Defendant
CHRISTOPHER A. FLOOD
SYLVIE J. LEVINE
```

1                 (Case called)
2                 MR. SWERGOLD:  Good afternoon, your Honor, Jason
3    Swergold for the government.
4                 THE COURT:  Good afternoon.
5                 MR. FLOOD:  Your Honor, good afternoon, Christopher
6    Flood, Federal Defenders of New York, here with Sylvie Levine
7    from our office and Mr. Kevin Johnson.
8                 THE COURT:  Good afternoon.
9                 Where are we?  I think it's time to set a motion
10   schedule.
11                MR. FLOOD:  Yes, your Honor.  Here is where we are.
12   We have had possession of electronic data and validation
13   studies from the OCME since the afternoon of March 21.  The
14   OCME did not enable Mr. Swergold to be able to provide rolling
15   discovery, unfortunately.  Since that moment we have provided
16   those materials to our experts and asked them to get back to us
17   as soon as they could.  Ms. Levine and I have been burning
18   midnight oil trying to clarify our understanding and sharpen it
19   around this very complicated topic.  And here is where we are
20   with regard to the Daubert issue.  We firmly believe that there
21   is a latent *Daubert* issue regarding the testing in
22   Mr. Johnson's case, although it's somewhat unripe because we
23   have not actually gotten expert notice from Mr. Swergold
24   because we have not requested it, so we got to go through those
25   sort of specific steps first, I think.

1              THE COURT:  Perhaps, but I thought you were going to
2    move to suppress the -- this is DNA, DNA that was allegedly
3    found on the gun.
4              MR. FLOOD:  That's right.
5              THE COURT:  You are going to suppress it, move to
6    suppress it on the ground that whatever scientific methodology
7    the government used, in your view, is not reliable, does not
8    comply with scientific methods, yadda, yadda, yadda.
9              MR. FLOOD:  Specifically any testimony that would be
10   offered would be unreliable.  It's not like if you violate the
11   Fourth Amendment.  It would be based in *Daubert*, which would be
12   that based on the Rule 702, which is that the expert testimony
13   that would be proffered --
14             THE COURT:  I see your point.
15             MR. FLOOD:  We can get that taken care of with speed.
16             THE COURT:  I can take care of the first part of it
17   very quickly.
18             MR. FLOOD:  Like that.
19             THE COURT:  Provide your notice.
20             MR. FLOOD:  Exactly.  Most of this is inferred in this
21   district as taking place, but we just need to know exactly what
22   that testimony will be.  And we can logically infer what it
23   will be, but we need to know exactly what it is.
24             It gets a little more complicated from here because we
25   have been working diligently with our experts who, by the way,

1  understand the urgency of this matter, and we have done what we
2  can to communicate to them the Court's expectations about
3  moving this along.  But as of right now we do not have
4  formalized reports from our experts.  Mind you, we have had
5  possession of five full disks of validation studies, very
6  voluminous, very complicated, some of it practically
7  inscrutable materials for about as long as it took for the OCME
8  to produce it.  They have been working through them.  And we
9  don't have a complete picture standing here right now of a
10 final understanding of how the OCME's work affected
11 Mr. Johnson's DNA report.
12          However, we do have a preliminary call from more than
13 one expert and this is where it gets complicated.  And this
14 comes back to the 702 problem.  We have been unable to check
15 the math, if you will.
16          THE COURT:  Let me interrupt you for a second,
17 Mr. Flood.  I know that you've written me on this before.  But
18 the issue is that it's not so much that you are contesting that
19 alleles that match your client were on the gun.  It is what are
20 the odds that sort of a very small DNA sample can be reliably
21 associated with a particular person.
22          MR. FLOOD:  That is embedded in part of our challenge.
23 But what FST, which is the program that's at issue here, does
24 is not even quite that.  It's a new paradigm.
25          Frankly, part of the problem here is, it's inherently

1  confusing.  A likelihood ratio is applied to the underlying DNA
2  profile.  Likelihood ratio is inherently different
3  statistically than what we have been used to for well onto
4  three decades now with DNA in the courtroom.  We are used to
5  saying, what's the likelihood that this DNA, that someone is
6  excluded or included as a source of this sample.  That's not
7  what the likelihood ratio does.  And what we have here let's
8  just talk about, there is a strap, a sample from a strap.  The
9  sample from the strap, there is a number associated with it.
10  It's 66 million.  What's the chance that you are going to go
11  pick somebody in a population and it's a 66 million chance that
12  it's Kevin Johnson.  That's not what the 66 million is.
13         The likelihood ratio in this case compares two
14  probabilities or two propositions, excuse me.  One proposition
15  is that -- on the top of this ratio.  The top of the ratio is
16  called the prosecutors' hypothesis, and that hypothesis is that
17  this DNA profile on the gun includes Kevin Johnson, despite the
18  fact that that profile on the gun only includes, by my
19  calculations, about 72 percent of his DNA alleles, that is,
20  it's missing about 28 percent of his alleles.  And on the
21  bottom it's typically referred to as the so-called defendant's
22  hypothesis.  We have rejected that title because, by the way,
23  they never asked us what our hypothesis is.
24         THE COURT:  I don't think the title is all that
25  important.

1          MR. FLOOD:  If we ever get to trial, we would moving
2   in limine not to use that word.
3          THE COURT:  That might be granted.  But we are a long
4   way from that, apparently.
5          MR. FLOOD:  Thank you.  That would be some unknown
6   source.
7          THE COURT:  That happens to share 72 percent of Kevin
8   Johnson's alleles.
9          MR. FLOOD:  Perhaps.
10         THE COURT:  All of which is a function of how common
11  are those alleles in the general population.
12         MR. FLOOD:  Among other things.  And in this case they
13  also included two unknown sources in both above and below.  And
14  along with that we have the whole drop in and drop out and a
15  number of other things that we are still trying to understand
16  what goes into FST.  They compare those two hypotheses.  In
17  that comparison -- by the way, neither of these hypotheses may
18  be true.
19         THE COURT:  Depends on how you define the second one.
20  It either is or it isn't his.
21         MR. FLOOD:  The point is, both of them are
22  conjectural.  It is not that one or the other has a claim to
23  accuracy.  It is that both of them are hypotheses.  When they
24  run the calculation, based on the internal workings of this
25  program, which is a black box program, not open source, which

1  is for the field a strong recommendation that this software

2  should be open source because there are so many variables that

3  moving one decimal point one way or another could change by

4  orders of magnitude the product at the end.  In Kevin Johnson's

5  case it's 66 million favoring the prosecutors' hypothesis.

6        The answer at the end is -- pardon me.  I have got to

7  get this one exactly right.  The evidence is true, or the

8  evidence is 66 million times more true if the prosecutors'

9  hypothesis than if the defendant's hypothesis.  It's a very

10 arcane way of trying to explain this DNA sample.

11       THE COURT:  It's not explaining the sample.  It's

12 explaining the likelihood that the sample came from your

13 client, right?

14       MR. FLOOD:  Not exactly.

15       THE COURT:  This isn't a low copy issue, right?  You

16 are not saying it wasn't a good sample.  The question is

17 whether given the fact that you don't have a full profile, is

18 it more likely that it's associated with Mr. Johnson than it is

19 with someone other than Mr. Johnson?

20       MR. FLOOD:  That is one of the fair questions that

21 could be asked of any sample and that is certainly why the

22 government would want to introduce it.  But the question is

23 whether the statistic fairly explains this to the jury.  And

24 under 702, offering the likelihood of ratio actually explains

25 that question in a way that's clear because that's not exactly

1   what the likelihood ratio answers.  It juxtaposes two different
2   hypotheses against each other and compares them, but it doesn't
3   go directly to what your Honor asked because it doesn't say it
4   makes it more likely that it came from Kevin Johnson.  Compared
5   to these two hypotheses, the internal workings of which we
6   don't fully understand.
7            THE COURT:  When are you going to get to an
8   understanding?
9            MR. FLOOD:  We are working towards that diligently.
10           THE COURT:  Here is what I'm thinking, Mr. Flood.  I'm
11  thinking that I can allow you to continue to work towards it or
12  I can give you a date by which you will understand it and you
13  will make a motion or we will go to trial.
14           MR. FLOOD:  We want to do both.
15           THE COURT:  I'd love you to do both.
16           MR. FLOOD:  Here is where we are at.  Because the
17  problem is FST.  That's the problem.  We need to be able to
18  check their math, your Honor.  That's the thing.
19           THE COURT:  You are not going to be doing the
20  arithmetic.  It's your expert that needs to do it.  And experts
21  typically operate against deadlines.
22           MR. FLOOD:  That's true.  But we have wrangled ours as
23  best as we can.  The problem with it is this and it is a
24  confrontation issue, ultimately.
25           THE COURT:  You don't have to persuade me that this is

1  important, Mr. Flood.  I'm there.  I've given you lots of time.
2  I fully appreciate the importance of the issue.  It's important
3  from a constitutional confrontation clause perspective, it's
4  important to your client's freedom.  The last thing I want is
5  have a jury convict him of possession of a weapon that he
6  actually didn't possess.  I agree it's important.  But even
7  important things need to come to an end.
8              MR. FLOOD:  I understand.  And I do not mean to try
9  the Court's patience.
10             THE COURT:  You are not trying my patience, not yet.
11 I want to set a schedule.  You are telling me how to build a
12 clock and that's lovely.  I just want to set a schedule.
13             MR. FLOOD:  The reason I'm laying this groundwork is
14 because what I need to ask the Court --
15             THE COURT:  You think I am not going to like it.
16             MR. FLOOD:  I know you are not going to like it.  What
17 we need is to get to the source code of FST because that's
18 where the math lies.  That's why open source is the --
19             THE COURT:  You need the source code.  They are not
20 giving you the source code.
21             MR. FLOOD:  Frankly, Mr. Swergold has been
22 forthcoming, but this is the OCME, they are not going to like
23 this either.  It's proprietary.  They have a copyright for it.
24             THE COURT:  It doesn't mean it does not have to be
25 produced.  It could be produced under a protective order.

1                 MR. FLOOD:  And we wouldn't object to that.

2                 THE COURT:  What's the story?

3                 MR. SWERGOLD:  Your Honor, up until I walked into the
4    courtroom today, defense has never requested the source code.
5    When I spoke to OCME after receiving the lengthy discovery
6    requests from the defense, one thing that was not in there was
7    the source code, and I had spoken with OCME about it at that
8    point, and they indicated that they do not want to turn over
9    the source code.

10                If the defendant is asking for it, I would at least
11   like an opportunity to go back with the OCME, find out what
12   their position is, and if we need to put in a letter on that
13   position.  And I don't want to delay things any further.  I
14   would like a schedule, too.  We can do that very quickly.  We
15   can do it while the rest of the schedule is set with respect to
16   when the defendant is going to file his motion.

17                THE COURT:  I don't think I can do that.  This is sort
18   of a whole other set of data.  What do I know about evaluating
19   source code.  It seems to me, the first thing we need to find
20   out is whether we are going to have to litigate whether they
21   will turn it over or they won't; and if they won't turn it
22   over, what's the import of that.

23                Why don't we do this.  Check with the OCME.  If they
24   want a court order, I'm happy to sign an order.  If they want
25   it under a protective order, limited to the defense's experts,

1  that's perfectly reasonable.  Do you know who his expert is?

2              MR. SWERGOLD:  I don't.

3              THE COURT:  You need to tell him.  You don't need to

4  tell me.  I don't care.  You need to tell him so he can tell

5  OCME, tell the medical examiners just in case they have some

6  particular issue with your expert that might figure into

7  whether they are agreeable to this or not.  Let me know by next

8  week, next Wednesday, which would be the 3rd or the 4th.

9              MR. FLOOD:  I believe it is the 3rd.

10             THE COURT:  By the 4th whether they will disclose it

11 or not; and if they will disclose it, when.

12             Is there anything else, Mr. Flood, other than the

13 source code that you feel like you are lacking in order to do

14 your job?

15             MR. FLOOD:  No.  That is the main issue.

16             THE COURT:  If they say no, then I am going to

17 schedule another status conference fairly quickly to talk about

18 where we are going from there.  If they say yes, then you also

19 need to tell me in the letter how long it's going to take to do

20 that, prepare an appropriate protective order, get it to me and

21 I'll sign it.

22             I don't think I can do anything else other than

23 exclude time between now and then in the interest of justice so

24 that you can get all the information that you need in order to

25 adequately defend your client.  I find that that interest

1  outweighs the public interest and the defense's interest in a
2  speedy trial.
3          Is there anything else?
4          MR. FLOOD:  No, your Honor.  Thank you.
5          THE COURT:  You could have told me you need the source
6  code.  That would have worked.
7          MR. FLOOD:  Fair enough.
8          MR. SWERGOLD:  Nothing from the government.
9          THE COURT:  Thank you.  I will see you all either
10 shortly or after you get the source code and after you see it.
11 Then you need to write me a letter telling me how long your
12 expert is going to need.  Make sure your expert understands
13 that I am getting itchy about this.  We need to go.
14         MR. FLOOD:  I assure you we are, too.
15         THE COURT:  I'm confident your client is.
16         Anything further?
17         MR. SWERGOLD:  No, your Honor.
18         THE COURT:  Anything further from you, Mr. Flood?
19         MR. FLOOD:  No, your Honor.
20         THE COURT:  Thank you.
21                           o0o
22
23
24
25