# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director*

*Southern District of New York*
Jennifer L. Brown
*Attorney-in-Charge*

June 29, 2016

BY ECF
Honorable Valerie E. Caproni
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

Re:     United States v. Kevin Johnson
        15 Cr. 565 (VEC)

Dear Judge Caproni:

### 1.  The OCME's submission is not genuinely responsive.

The submission of June 24, 2016, ("the submission") offered by the Office of the Chief Medical Examiner (OCME) in response to the Court's Order of June 17, 2016 ("the Order") is the lab's best case.  It is also inadequate, exaggerated, and unconvincing.  Continuing to ignore the reality that Your Honor has already fully considered the OCME's position, found Mr. Johnson meets the test set forth in *Nixon v. United States*, 418 U.S. 683 (1974), and on June 14, 2016 issued an Order granting a Subpoena under Fed. R. Crim. Pro. 17, ("the subpoena"), the lab has taken the occasion presented here as an opportunistic forum to re-litigate settled issues.

Yet the Order is unequivocal:  The OCME *must* respond to our letter of June 16, 2016, and *must* explain why a protective order would not suffice to protect their property interest in FST.  The OCME's choice to ignore the major directives of the Order powerfully demonstrates that they cannot rebut our June 16th letter.  Further, the lab's best effort to explain why a protective order would be inadequate here has instead done much to demonstrate just how questionable the necessity of a protective order is to protect what legitimate interests they have in FST.

On this extensive record, where the OCME has been ably represented by the United States Attorney's Office, and has now had two separate opportunities to independently and clearly convey the basis for any new objection to this Court's ruling, Your Honor should consider the matter concluded, deny their motion to quash and enforce the subpoena.

1

2.   The submission recycles settled disputes under *Nixon*.

The OCME fails to engage on any ground raised in our June 16th letter.[1] Instead, the lab – yet again – reiterates its attack under the *Nixon* factors. Aside from being settled by this Court's ruling of June 7, 2016, the *Nixon* factors are hardly what call for a response in our June 16th letter. The submission does nothing to address the *res judicata* status of the subpoena, a legal fact established given the OCME's representation by the United States. Neither admitting nor denying the substance of what we raise, the lab's choice to altogether avoid the issues should carry consequences. *Cf. Kule-Rubin v. Bahari Group Ltd.*, 2012 WL 691324, at *3 (S.D.N.Y. Mar. 5, 2012) ("Although a party may deny an allegation if the party lacks sufficient knowledge or information to form a belief about the truth of an allegation...in any other circumstance an answer that neither admits nor denies allegations is deemed to admit the truth of those allegations.")(citations omitted).

Instead of responding as ordered, the OCME objects to us accessing the code. Recycling arguments they already presented in their letter of June 15, 2016, the lab reiterates claims which have comprised the Government's position since the source code issues were introduced at the April 28, 2016 conference (*see, e.g.*, Gov't Ltr., May 3, 2016 (Dkt. No. 37)). Remarkably, even as the OCME frames their evasion of the Order as an effort to correct putative "material inaccuracies" in a defense submission that was publicly filed over a month ago[2], the lab repeats demonstrably false assertions that we have already shown to be baseless.

For example, in an effort to show that we have sufficient raw material to somehow reconstruct LRs analogous to those calculated in this case, the OCME professes that the lab itself performed "manual calculations" of LRs in its validation of FST. This claim is patently false, and its veracity has not improved with repetition. These are the same "manual calculations" we have already demonstrated added up to merely 24 fragments of profiles – many a single locus - out of the total number of 557,000 LR calculations in the validation study. *See* Def. Ltr. May 27, 2016, p. 13-14. The OCME is surely aware of this enormous discrepancy. Yet in focusing on irrelevant and settled issues, the lab still manages to present baseless claims. That the OCME would employ such tactics demonstrates the fundamental fragility of its position.

---

[1] The OCME opens with a material error, stating that its intervention here is their "first opportunity to address the Court's Subpoena Duces Tecum of June 14, 2016...served on June 15, 2016." While it is not disputed that the first time the OCME submitted a document in this case was only after the issuance of the subpoena, we served the OCME on June 14, 2016, the same day the subpoena was issued, as the return stamp on our copy reflects, not June 15th, as they represent.

[2] The appropriate moment for the OCME to have raised any such objections was at the time the submission was filed. *See United States v. Kleen Laundry & Cleaners, Inc.*, 381 F. Supp. 519, 523 (E.D. N.Y. 1974) (finding a motion to quash or a motion for a protective order by person subpoenaed by grand jury process should be made when abuse becomes apparent, not after indictment is handed down and long after any possibly abusive conduct has ceased).

3. **The submission contemplates an inappropriate legal standard and demonstrates adequate protections are already in place.**

Postulating a balancing test that creates a false equivalence between property interests and constitutional rights, the OCME fundamentally misconstrues the applicable law and the claims at stake. Though citations to the United States Constitution, the United States Code, and a recent Act of Congress crowd the page, none of these authorities add weight to the OCME's position. Nor could they, as it is simply untenable.

Production of the materials as ordered would deprive the OCME of no "right" whatsoever. Nowhere in the subpoena is the OCME required to divest itself of its ownership interest in FST, to transfer title to the defense, or to surrender its copyright. Yet much turns on this implicit canard. Yet in what has become a predictable pattern of exaggerations and misdirection, the OCME goes so far as to claim that compliance would threaten the public fisc, reverberating from City Hall through Albany to Capitol Hill. Seemingly no function of government is unaffected of Mr. Johnson's access to FST's code.

The authority cited to support this imaginary parade of horrible consequences is the Defend Trade Secrets Act of 2016, Pub. L. no. 114-153, 130 Stat. 376 (signed May 11, 2016)("DTSA"), which actually undermines the OCME's position. Establishing a cause of action for the violation of intellectual property rights, this legislation adds further protections for the lab. Considering how many concentric rings of security are available to the OCME regarding its interest in FST – copyright protections, DTSA rights, common law causes of action, and, should the Court so conclude, any protective order – it is striking that that the lab portrays each as subtracting, rather than adding, protection. This is not a reasonable interpretation of the facts or of the law.

Compliance will not impair what market there may be for FST. The Copyright Act and DTSA amply protect the holder of intellectual property with remedies in the event that such information is used improperly. As it must, the OCME acknowledges that FST is subject to those safeguards but does not and cannot articulate why they are insufficient to the task.

4. **The claimed harm from compliance is patently unreasonable.**

From the outset, the OCME's objection is predicated on the false notion that compliance threatens a property interest and therefore the market value of FST. This is sophistry. Valuable materials must be and are reviewed in the course of litigation every day and yet the nation's economy is robust. Protective orders are the common currency of exchange that allow proprietary information, not infrequently the subject of disputes, to be brought before the courts.[3] Some of the world's most valuable trade secrets owned by corporate giants like Apple, Google, and Coca-Cola have been disclosed in litigation subject to the terms protective orders. *See* Def. Ltr. May 4, 2016 (Dkt. No. 39) (citing *Coca-Cola*

---

[3] *See e.g.* Cal.Evid.Code §§ 1061, 1062, 1063. (setting forth state law grounds for "trade secret" privilege and remedy of a protective order); *see also People v. Superior Ct.* (*Chubbs*), No. B258569, 2015 WL 139069 (Cal. Ct. App. Jan. 9, 2015) (interpreting Cal.Evid.Code §§ 1061, 1062, 1063 in a criminal case to require a *prima facia* showing of relevance and necessity); *but see* Cal.Rules of Court, Rule 8.1115(a)(Unpublished opinions "[m]ust not be cited or relied on by a court or a party in any other action.").

*Bottling Co., of Shreveport, Inc. v. Coca-Cola Co.*, 107 F.R.D. 288, 289, 300 (D. Del. 1985) (ordering disclosure of Coca-Cola's secret formula - "one of the best-kept trade secrets in the world" - under a protective order that "both allows access to information and prevents disclosure of trade secrets")). The OCME has provided no grounds to distinguish FST from the vast run of materials in the stream of commerce that can be disclosed pursuant to subpoena and, if necessary, protective order. If compliance can be accomplished where genuine commercial interests are at stake, the OCME's arguments against compliance here should be recognized as merely tactical.

Setting aside the material fact that the OCME has not made a showing that FST has ever been marketed, and further that it actually appears to be in the process of being phased out of use, the singular characteristic of FST that distinguishes it from other probabilistic genotyping software is that it was built around a custom drop-out study conducted within the OCME's lab. Thus, it is difficult to see how it could be readily transferable to any other lab at all. Given such natural market constraints, the OCME has failed to show how compliance with this Court's subpoena is in any way unreasonable, or has in any authentic sense added a true burden to whatever actual commercial interest the lab may genuinely have in FST.

It bears attention that in the criminal context it is equally by Rule 17 *duces tecum* subpoena that federal Grand Juries, the Government, and defendants like Mr. Johnson all obtain documentary production. *See* 2 The Late Charles Alan Wright, et al. Fed. Prac. & Proc. Crim. § 271 (4th ed.). Developing FST for the purpose of creating evidence for use in criminal casework, the OCME knowingly subjected itself to all of the law applicable in this domain, including the Constitution, as well as the demands of the Federal Rules of Criminal Procedure and Evidence. Discovery, including compulsory process, is woven through those obligations.

In truth, it is patently obvious that this Court's subpoena does not interfere with any property right, the OCME's distractions notwithstanding. Even in the conjectural possibility that it could, a reasonable protective order would amply secure any concerns beyond necessity.

Yet, arguing that a protective order would not be adequate, the OCME greatly miscomprehends the term "use", and reveals a casually dangerous viewpoint that is patently unreasonable. It is not "use" of the code for an expert to remember it after seeing it, whether in Mr. Johnson's case, or in a hypothetical future defendant's case. The OCME cannot govern the knowledge obtained by the experts conducting the review. It causes the lab no harm for Dr. Chakraborty or any other expert to recall that the source code was flawed, or that it was pristine. Such thoughts are not commercial, and they do not affect the OCME's copyright. If such knowledge were cognizable harm, then the OCME could also object to Mr. Johnson's counsel, since we also learn about the code in the course of this litigation. There is no principled basis not to extend such objections to the Court as well, or to the prosecution, and so on until the OCME has constructed a system free of dissidents or doubters.

This is far beyond the scope of any reasonable litigation position, but it is precisely what the OCME articulates as to why a protective order would be inadequate to protect their

4

interest: "[I]t would be difficult to enforce a provision limiting the *use* of the source code to any particular case: once someone with understanding has reviewed it, that person would never be able to "unsee" the code in a way that would limit their knowledge to the case with the protective order – to unring the bell, as it were." (OCME submission, June 24, 2016, p. 3).(emphasis added).

This is a novel and dangerous vision of harm. No case considering a protective order has ever recognized a public lab's interest in maintaining ignorance. It is one thing to ensure that copyrights are protected and legitimate property interests are not violated; it is quite something else to insist that reputable scientists like Dr. Chakraborty cannot be allowed to think freely about what he sees. This putative harm simply is not cognizable. It stretches basic terms like "use", "retention", and "fairness" beyond all recognition. In short, this unreasonable and novel argument articulates no harm whatsoever.

What the OCME appears to request regarding the terms of a review would predictably amount to no review at all, restricted to the experts of their choice (the names of whom they have had for nearly two months), at a location, time, and duration of their choice, in a format of their choice, under their supervision, and without the ability to retain or use – or even remember – the code in any way. This aspirational level of dominance is beyond the OCME's power even if they had made anything like a convincing showing, which they have not. Courts have recognized that "it is common for experts in small, close-knit industries....to have served as consultants in the industry...[T]o preclude [the expert] would make it extremely difficult to identify an expert who could testify in this action." *AG Fur Atherische Ole v. Gucci Americ, Inc.* 2006 WL 838996 (S.D.N.Y. 2006). Further, the OCME has not made a showing of why such straitjacketing restrictions are necessary or even reasonable, let alone fair or anything other than dilatory. The lab offers no authority for its position other than "other circumstances." Their terms are absurdly onerous and should be rejected out of hand.

The FST code itself is protected by the laws of copyright, the DTSA, common law remedies against conversion, the obligations counsel and our designees have as officers of this court and under the Code of Professional Responsibility, and should the Court elect, a reasonable protective order. On this record, however, the OCME has not provided Your Honor with a reasonable basis for anything more than the protections afforded by statute and common law.

## 5. The OCME has not met the standard under Rule 17(c)(2) to quash or modify.

In the normal course, the party seeking to quash or modify a subpoena must explain the harm they are trying to prevent. The burden is on those seeking redress to clearly and specifically articulate the harm against which the order would protect. *Cf. In re Roman Catholic Archbishop of Portland in Oregon*, 661 F.3d 417 (9th Cir. 2011)(noting that broad allegations of harm from public disclosure, unsubstantiated by specific examples or articulated reasoning, do not satisfy the good cause test for a protective order). In the context of Rule 17, such orders are most often on consent, or otherwise imposed under Rule 17(c)(3) to protect the personal or confidential information about crime victims. Here, however, Rule 17(c)(3) is inapplicable, and consent is clearly absent from the submission.

5

The Court's remaining power to fashion a protective order here falls under Rule 17(c)(2) which sets forth the same two-prong standard for either quashing or for modifying a subpoena, that "compliance would be unreasonable or oppressive." Fed. R. Crim. Pro. 17(c)(2). A protective order would be readily available as a modification had the OCME made even a minimal particular showing that the subpoena was either unreasonable or oppressive. The submission is, in logical and legal effect a motion under 17(c)(2). Here, Your Honor's unequivocal Order of June 15, 2016 directed the OCME in no uncertain terms to explain why a protective order would not be sufficient to protect its interest in the FST source code. This language is indistinguishable from an order directing the lab to file a motion to explain why the subpoena should not be modified to include a protective order (or in the alternative quashed). Accordingly, the OCME's June 24, 2016 submission is and should be considered for all purposes to be its motion under Rule 17(c)(2). Because there is no reasonable basis by which it can be sustained, however, it necessarily fails.

The decision to modify the subpoena is entrusted to the Court's sound discretion, not to be disturbed absent a clear showing of arbitrariness or abuse of discretion. *In re Irving*, 600 F.2d 1027, 1034 (2d Cir. 1979), cert. denied, 444 U.S. 866, 100 S. Ct. 137, 62 L. Ed. 2d 89 (1979). While the defense remains willing as ever to enter a reasonable protective order, it has become increasingly clear through the course of this litigation that the OCME cannot articulate any basis for a protective order whatsoever. Under these circumstances, the Court's discretion is paramount.

6. **The Order will enable an efficient and secure evaluation of FST.**

The Court has ordered production of FST in the native file format on portable drives. This will facilitate the most expeditious and efficient review of the code. This way, the drives will be sent to our experts to conduct the review with due speed. Any other course will incur the time and significant expense of demanding that all of our experts coordinate their work and travel schedules to allow for indeterminate time in New York at a location designated by the OCME. Given the history of this case, such a requirement would likely, in turn, invite hindrance and significantly impact the briefing schedule set by the Court and strain our resources as the public defender's office.

The OCME's vague objections as to native format and portable drives are non-specific, offering no reasons, no alternatives, no tangible proposals, and in sum, amount to unjustified and escalating obstructions. Asking far too much of this Court without providing anything like a reasonable basis for it, the OCME's apparent alternative proposals should be rejected.

7. **Conclusion**

The OCME presents their best arguments for quashing, or at a minimum, modifying a subpoena, pursuant to Rule 17(c)(2). Ordered to respond to our letter and to explain the efficacy of any protective order, the OCME repeats that which the Court has considered, inadvertently makes clear that concentric layers of protection are in place from other sources, and cannot articulate a single cognizable harm. The submission thus fails to meet the two-prong standard for quashing or modifying a subpoena: that "compliance would be unreasonable or oppressive." Fed. R. Crim. Pro. 17(c)(2). Coupled with the Government's robust representation of the lab, the OCME has been heard.

6

In opposition to such a motion, Mr. Johnson must meet the *Nixon* standard. *United States v. Barnes*, 560 F. App'x 36, 39-40 (2d Cir. 2014)   As the Court ruled, he already has.

A motion to quash "should be made when the abuse becomes apparent." *United States v. Kleen Laundry & Cleaners*, 381 F.Supp. 519, 523 (E.D.N.Y. 1974). Rule 17(c)(2) requires that such a motion be "prompt." The OCME was demonstrably aware of our intent to seek the source code since at the latest May 3, 2016 and throughout subsequent litigation leading up to Your Honor's ruling of June 14, 2016. They chose to let the United States Attorney's Office represent their interests in those proceedings. Yet even in the submission of June 24, 2016, which is in effect also their motion to modify the subpoena under Rule 17(c)(2), they seek permission to file a motion to quash, which also would necessarily be filed under Rule 17 (c)(2). Nothing new can or will come of this. Your Honor's Order was unequivocal. Everything was at stake in this round, and they have not met the standard. As their submission clearly shows, any future motion which the OCME would seek to file would be duplicative, repetitive, and place an undue burden on Mr. Johnson.

The subpoena of June 14 directed the OCME to produce the source code *forthwith*. Two weeks later, the time for compliance has passed.

Respectfully submitted,

Christopher Flood
Sylvie Levine
Assistant Federal Defenders