# EXHIBIT C

# Declaration of Nathaniel Adams

I, Nathaniel Adams, declare pursuant to 28 U.S.C. § 1746, that I have personal knowledge of the following, and if called upon to do so, could and would testify competently to the matters contained herein.

## 1  Qualifications

I have a Bachelor of Science degree with a major in Computer Science from Wright State University (Dayton, Ohio). I am enrolled in the Graduate School at Wright State University, pursuing a Master of Science degree in Computer Science. I am employed as a Systems Engineer at Forensic Bioinformatic Services, Inc. in Fairborn, Ohio. My duties include analyzing electronic data generated during the course of forensic DNA testing; reviewing case materials; reviewing laboratory protocols; and performing calculations of statistical weights, including custom simulations for casework and research projects. I actively use, develop, and maintain a number of software programs to assist with these efforts. I have been involved in several reviews of probabilistic genotyping analyses in criminal cases, including FST. In 2014 I attended a week-long workshop on interpreting forensic DNA mixtures using emerging software solutions. In January 2016, I was retained in a criminal case and inspected the source code of the commercially-available probabilistic genotyping program STRmix™. Due to a non-disclosure agreement that I signed, I am not allowed to discuss the findings of my review of STRmix™ outside of that particular case.

## 2  Overview

I have been asked by Sylvie Levine and Christopher Flood to conduct a code review of the Forensic Statistical Tool (FST). I have previously provided a statement dated May 27, 2016 regarding the utility of code reviews when evaluating probabilistic genotyping systems such as FST.

# 3  Setup

## 3.1  Materials provided

For this review I received a set of materials on a flash drive. These materials included a Microsoft Visual Studio solution[1] named "FST_Production" which includes source code and application configurations. Two database backup files were included in the solution.

I have also received the New York City Office of the Chief Medical Examiner (NYC OCME) "Forensic Statistical Tool Validation" documents in PDF format as well as casework materials describing DNA analyses conducted by OCME in the case US v. Kevin Johnson.

## 3.2  Review environment

Microsoft Visual Studio 2015 Community Edition was used for all code inspection, compilation, debugging, and execution on a PC running Microsoft Windows 7 Professional Service Pack 1 (64-bit). Microsoft SQL Server 2016 Express on a PC running Microsoft Windows 8.1 Professional (64-bit) was used for restoration of the database backups and all database functionality of the FST system. Portions of inspection and testing utilized Microsoft Internet Explorer version 11.0.

## 3.3  Build

In Microsoft Visual Studio, the term "build" is equivalent to the concept of compile-and-go[2], which automates multiple configurable steps of translating the source code to an executable program, including the compilation[3] step. That equivalency is maintained in this document.

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

---

[1] Solution: "Group of related projects with which a user works." In this context, a "user" is a user of Visual Studio, e.g. a software developer, rather than a user of the FST software. (Microsoft Developer Network, "Visual Studio 2015 SDK Glossary." Available: https://msdn.microsoft.com/en-us/library/bb166253.aspx)

[2] Compile-and-go: "an operating technique in which there are no stops between the compiling, linking, loading, and execution of a computer program" (ISO/IEC/IEEE, "Systems and software engineering -- Vocabulary," ISO/IEC/IEEE 24765:2010(E), vol. 2010.)

[3] Compile: "to translate a computer program expressed in a high-order language into its machine language equivalent" (ISO/IEC/IEEE, "Systems and software engineering -- Vocabulary," ISO/IEC/IEEE 24765:2010(E), vol. 2010.)

████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████

I had to modify portions of code and application configurations in order to get a copy of FST running on my local systems. The steps taken to build a working copy of FST are described in [Appendix A – Refactoring]. Following these steps, I was able to access the FST user interface as described in [Appendix B – FST Interface].

# 4 Assumptions

## 4.1 Code version

I assumed that the Visual Studio solution and code contained therein provided to me is identical to the solution used to build the version of FST used in OCME's DNA analysis conducted in the case US v. Johnson, i.e. the "code base" of FST v2.5.

## 4.2 Documentation

I assumed that materials describing the design and development of FST would be provided to me.

## 4.3 Build and operating environments

Expected differences between the executables built on my PC and built by OCME are limited to those introduced by different versions of Visual Studio, Microsoft SQL Server, and operating systems used by me and by OCME. I assume these differences are minimal. To explore potential differences, I attempted to replicate the calculations performed by OCME's version of FST used in the case US v. Johnson. Upon comparison, results from my build and OCME's build of FST appear to be indistinguishable for the samples OCME analyzed in the case US v. Johnson. See OCME materials with Bates stamp KJ_00173 and KJ_00174 and [Appendix C – US v. Johnson reproductions].

## 4.4 Validation materials

I assumed that all materials included in the FST validation documents apply to the version of FST provided to me unless indicated otherwise.

# 5  Review

Primary goals of this review included:

Aim 1 - To compare the instructions (source code) and observed behaviors of FST to the requirements, specifications, and design documents (describing intended behaviors) generated during the development and maintenance of FST. A conceptual description of these materials is available in my May 27, 2016 statement.

Aim 2 - To compare the coding style and standards with which FST was developed with practices common to the field of software engineering.

Aim 3 - To perform a limited set of tests on the system to identify any behaviors that detectably depart from intended operations.

Screenshots included in the appendices accompanying this statement are documentation of actions taken during the course of my review.

## 5.1  Documentation

### 5.1.1  Software engineering materials

As described in an article by Coble, et al. in "DNA Commission of the International Society for Forensic Genetics: Recommendations on the validation of software programs performing biostatistical calculations for forensic genetics applications"[4], "International industry standards apply to software validation, verification and test documentation." Standards can also be codified by professional organizations, government agencies, or internal to an organization such as OCME.

In the materials I have been provided, I have not seen any reference to standards governing the development, testing, or validation of FST. Materials contained in FST Validation Vol. 1, "Methods," could be considered germane to descriptions of program requirements, specification, design, and testing. However, these materials do not cover the entire span of the program such that it could be precisely replicated from these materials or sufficiently tested against during the validation & verification stage of the software development process.

---

[4] M. D. Coble, J. Buckleton, J. M. Butler, T. Egeland, R. Fimmers, P. Gill, L. Gusmão, B. Guttman, M. Krawczak, N. Morling, and others, "DNA Commission of the International Society for Forensic Genetics: Recommendations on the validation of software programs performing biostatistical calculations for forensic genetics applications," Forensic Sci. Int. Genet., vol. 25, pp. 191–197, 2016.

Enumerated requirements can increase transparency of the development materials by allowing for references made in the source code to the collection of requirements. ██████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████ Ideally, all source code used to build a software program could be attributed to specific requirements defining that program's intended behavior.

### 5.1.2  Manuals

A manual for operating FST is included in the FST Validation materials. The provided manual includes instructions and figures that indicate differences between the version of FST described in the validation materials and the version provided to me. See FST Validation Vol. 1, "Methods," Sec. VI, "Manual," Figures 1D-E and [Appendix B – FST Interface, Figure B.2 and Figure B.3] accompanying this statement. Notable differences include the "Version 2.5" logo, replacement of a "Degraded Type" dropdown box with a "Lab Kit" dropdown box, and the differences in comparison types available.

From the materials provided to me, it is unclear which portions of the FST software underwent additional development between the time of producing the FST Validation materials and the provision of the FST solution in the case US v. Johnson. In order for the FST Validation materials to provide relevant context to this review (and to casework in general), it is important to fully understand if the differences between versions of FST evaluated during validation and during this review are entirely cosmetic or if any functional behaviors differ.

## 5.2  Testing

Software testing[5] can be performed in many ways and from many perspectives. The extent of testing expected to be performed during the development of a program is proportional to the importance of its correctness. That is, it is qualitatively more important to conduct extensive testing on a software system regulating a pacemaker than in a video game. While software defects extant in a video game's code can be potentially overlooked by users or rectified by software updates, injury or loss of life cannot be so simply addressed.

---

[5] Testing: "an activity in which a system or component is executed under specified conditions, the results are observed or recorded, and an evaluation is made of some aspect of the system or component" (ISO/IEC/IEEE, "Systems and software engineering -- Vocabulary," ISO/IEC/IEEE 24765:2010(E), vol. 2010.)

Similarly, the extent of software testing expected of a software developer should be increased when the operation of the software is difficult to test comprehensively prior to its use in a real-world system.  Software defects affecting a medical device and a space probe were addressed in my May 27, 2016 statement.

### 5.2.1   Unit tests

One common perspective of testing is the unit test[6], whereby individual subcomponents of a larger program are tested for correctness, given pairs of known inputs mapped to known outputs. Allowable inputs and expected behaviors should be defined by the requirements and specifications enumerated for the program.

Subcomponents tested by unit testing can be combined together for integration or component testing. Eventually, the program can be tested in its entirety. As described in my May 27, 2016 statement, there are noted difficulties (or impossibilities) for testing whole probabilistic genotyping systems due to the lack of known ground truths for likelihood ratio calculations performed on noisy casework data.

Some portions of the FST Validation could be considered unit tests, e.g. the tests and results described in FST Validation Vol. 1, "Methods," Sec. IV, "Program Evaluation." However, table 1F in this section describes testing across only 11 of the 15 autosomal loci typed by the Identifiler genotyping kit used in this study, and these 24 total evaluations involved changing multiple variables between tests (numerator and denominator hypotheses as well as template amount).

### 5.2.2   Extent of testing

Test coverage[7] can be quantified in a number of ways. Branch[8] coverage can be quantified by comparing the number of branches tested to the number of total branches. Path[9] coverage can

---

[6] Unit test: "a test of individual programs or modules in order to ensure that there are no analysis or programming errors." (ISO/IEC/IEEE, "Systems and software engineering -- Vocabulary," ISO/IEC/IEEE 24765:2010(E), vol. 2010.)

[7] Test coverage: "the degree to which a given test or set of tests addresses all specified requirements for a given system or component" (ISO/IEC/IEEE, "Systems and software engineering -- Vocabulary," ISO/IEC/IEEE 24765:2010(E), vol. 2010.)

[8] Branch: "a computer program construct in which one of two or more alternative sets of program statements is selected for execution" (ISO/IEC/IEEE, "Systems and software engineering -- Vocabulary," ISO/IEC/IEEE 24765:2010(E), vol. 2010.)

[9] Path: "in software engineering, a sequence of instructions that may be performed in the execution of a computer program" (ISO/IEC/IEEE, "Systems and software engineering -- Vocabulary," ISO/IEC/IEEE 24765:2010(E), vol. 2010.)

be similarly quantified. Branches or paths of particular importance can be selected for testing or emphasized over less critical parts for more rigorous testing performed during development. Exploration into the amount of testing needed can even help developers reduce a program's complexity before any testing is conducted, proactively reducing the complexity and quantity of tests needed.

It is impossible to objectively test a program's actual behavior against its intended behavior unless its intended behaviors are objectively defined (i.e. in requirements and specifications). Any ambiguities in the specified requirements are necessarily addressed subjectively by the developers. It is difficult to assess the appropriate extent of software testing even when specifications are precisely defined. It is substantially more difficult to determine the appropriate extent of software testing when the object of the testing has no objective standard for correct behavior.

The use of software programs as a component of the *system* of forensic DNA analysis prompts the questions "when" and "how" probabilistic genotyping software systems should be tested. Coble, et al. suggest[4]:

> The DNA Commission differentiated developmental from internal (laboratory) validation and emphasizes that the software used is an integral part of the evidential process and **should not be treated as a separate and isolated component**. [emphasis added]

I strongly disagree with this guidance. It is my experience (to the extent that I am free to comment on it) that the development of probabilistic genotyping software is *substantially* less mature than the field of software engineering itself, *especially* in the domain of software testing, validation, and verification. When a probabilistic genotyping system has been developed, it should be tested on its own, in accordance with strictly defined test criteria developed from its own requirements and specifications documents. If it sufficiently passes all tests in isolation, *then and only then* should it be considered for comprehensive testing within the greater forensic DNA analysis process.

If the software is tested in isolation, aberrant behaviors, including outright defects, do not risk being "explained away" by the same noisy profile data that inhibits our ability to assert ground truths for testable likelihood ratios. The field of software engineering has had its own standards for validating software for decades, and it is very reasonable to draw on these general standards directly.

For reference, the Scientific Working Group on Forensic DNA Analysis Methods published a 12-page document[10] in 2015 on validating probabilistic genotyping systems, only a portion which applied to the development of software, and *none* of which addressed software engineering standards. The International Society for Forensic Genetics (ISFG) published a 15-page document[4] in 2016 on validating probabilistic genotyping systems. ISFG makes reference to two long-extant, 100+ page documents[11,12] published by the Institute of Electrical and Electronics Engineers (both of which are already marked as superseded) *and* a 14-year old guidance document[13] from the Food and Drug Administration. Multiple frameworks for validating general-purpose software have long been codified and continue to be revised by organizations such as IEEE. A framework for validating biological software with complex and safety-risk-prone components has been considered and codified by the federal government. While the field of forensic DNA has no public and widely used software standards specific to the field, we can draw on standards describing good practices that generally apply to all software development processes.

I have seen no quantitative description of test coverage in the FST Validation materials. The time that it would take to quantitatively evaluate the extent of testing FST has undergone is outside the scope of this review.

### 5.2.3  Test code and automated software testing

"Test" code can be written parallel to a software program's code and is one of the most common practices throughout software engineering. The purpose of test code is not to provide any functional behavior or fulfill any requirement of the software, but rather to ensure that the program's code fulfills its requirements by testing its actual behavior against its expected behavior. Unit tests are commonly written as code segments within the software's solution. Multiple test frameworks exist for assisting developers with automated testing, some even writing the code automatically. Modern development environments, including Visual Studio,

---

[10] Scientific Working Group on DNA Analysis Methods. Guidelines for the Validation of Probabilistic Genotyping Systems. Available at - http://www.swgdam.org/publications
[11] IEEE Standard for Software and System Test Documentation. (2008). IEEE Std 829-2008.
[12] IEEE Standard for System and Software Verification and Validation . (2012). IEEE Std 1012-2012 (Revision of IEEE Std 1012-2004).
[13] Food and Drug Administration. (2002). General principles of software validation; final guidance for industry and FDA staff. Available at - http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm085281.htm

include features for executing automated software tests each time the program is built, ensuring that no new defects are detected after modifications have been made to the program's code.

A notable advantage of writing test code is that, even in the absence of precise requirements and specifications definitions, test code can serve as a de facto specification since all tests should have explicit pass/fail criteria. These tests' pass/fail criteria can implicitly describe a program's expected behaviors. An entire approach to software development, called test-driven development, utilizes this approach to software development rather than the traditional hierarchical process described in the appendix of my May 27, 2016 statement.

Similar to unit tests, higher-level component and integration testing, regression testing, and random testing can be automatically executed prior to building a solution or as a step of the compile-and-go build process. A practice called "nightly builds" involves taking the snapshot of the current code in a version control system and attempting to build the solution, triggering any automated testing processes specified therein. In this way, developers are more prone to notice software defects caused by their recent modifications, allowing them to make any needed changes before the defect becomes more tightly integrated into the system.

I have seen no code indicating that any test code has been written for, or automated software testing has been performed on, FST.

## 5.3   Validation and verification (v&v)

A definition of validation is provided by IEEE as, "The confirmation, through the provision of objective evidence, that the requirements for a specific intended use or application are fulfilled." It is necessarily difficult to validate a program for which explicit requirements and specifications have not been established.

It is worth considering, due to the incomplete and at-times ambiguous descriptions of FST's intended behaviors, whether FST has been validated, partly validated, or not yet validated from a software engineering perspective.

Using IEEE's definition of verification, "The process of evaluating a system or component to determine whether the products of a given development phase satisfy the conditions imposed at the start of that phase," it is difficult to assess what verification processes have been undertaken during FST's validation and continued use.

I have seen no document resembling a software development plan describing stages of development, against which comparisons for verification of FST could be made.

It is reasonable to expect that unanticipated requirements changes were made following the failure to validate FST for four-person mixtures, which presumably gave rise to the note on the login screen seen in [Appendix B– FST Interface, Figure B.1]. Since this change necessarily followed at least a portion of the validation study conducted by OCME, and along with the changes and undocumented behavior noted in [5.1.2 Manuals and 5.6 Undocumented behavior], further investigation is indicated into the software validation and verification processes conducted on FST.

### 5.3.1   Perception of v&v

Overlapping terms of art between software engineering and forensic biology should be distinguished. A "validation study" in the field of forensic DNA is ultimately intended to determine the limits of certainty with which a laboratory, utilizing certain processes, can confidently arrive at a given conclusion. Ideally, the confidence with which the conclusion is stated and the significance of the conclusion are quantified. The manifestation of forensic DNA's "statistical weights" in the form of random match probabilities, probabilities of inclusion, and likelihood ratios are direct responses to this ideal.

However, validation of a software system is a comparison of a program's intended and actual behaviors. The limits of confidence with which the software can report a particular conclusion is part of a greater process of scientific inquiry and is *not* part of the validation efforts from a software engineering perspective. Conflation between these two concepts is detrimental to understanding the relationship of both. A *validation study* of a forensic DNA analysis process involving software should incorporate the uncertainties inherent to the software system(s) and should only follow the conclusion that the software itself has been validated.

### 5.3.2   Independence

Regarding the independence of software validation, the FDA states[13]:

> Validation activities should be conducted using the basic quality assurance precept of "independence of review." Self-validation is extremely difficult. When possible, an independent evaluation is always better, especially for higher risk applications.

IEEE defines[22] "independent" as, "performed by an organization free from control by the supplier, developer, operator, or maintainer."

I am unaware of any independent review of FST's development process prior to this review.

## 5.4 Code maintenance

### 5.4.1 Code ownership

The concept of code ownership is that the developer who originally wrote or currently maintains the code is an authority on its behavior. Should a future developer uncover issues in the existing code or create issues when modifying the code, the author can be used as a human reference. Over 100 source code files are included in the FST solution, each presumably having been authored or at least modified by a human developer. I conducted a keyword search of the entire solution for terms indicating authorship of original code or modifications made to existing code. I located three files that have comments[14] explicitly describing authorship. I located only five files that had any comments attributing a contribution or modification to a particular developer. Developers noted in these comments are Vivien Song, Dhrubajyoti "Dhruba" Chattopadhyay, and "win." I found no other references to whomever "win" is.

Overall, it is unclear from my review who authored the majority of the code constituting the FST solution. It is possible that inspection of the version control system could provide further information. See [5.4.4 Version control] for further discussion.

### 5.4.2 Code attribution



Taking code from unknown sources can lead to using code that is poorly understood and possibly dangerous. No URL's to the original Stack Overflow web page are provided for reference by future developers. The original author is not acknowledged, nor is contact information for him/her provided. Further implications of using unattributed, unlicensed, "borrowed" code is outside of the scope of this review.

---

[14] Comment: "information embedded within a computer program, job control statements, or a set of data that provides clarification to human readers but does not affect machine interpretation" (ISO/IEC/IEEE, "Systems and software engineering -- Vocabulary," ISO/IEC/IEEE 24765:2010(E), vol. 2010.)
[15] http://stackoverflow.com/

### 5.4.3  Coding style

#### 5.4.3.1  Coding conventions

The Microsoft Developer Network describes coding style guidelines[16]:

> The C# Language Specification does not define a coding standard. However, the guidelines in this topic are used by Microsoft to develop samples and documentation.
>
> Coding conventions serve the following purposes:
>
> - They create a consistent look to the code, so that readers can focus on content, not layout.
> - They enable readers to understand the code more quickly by making assumptions based on previous experience.
> - They facilitate copying, changing, and maintaining the code.
> - They demonstrate C# best practices.

Coding style guidelines are generally stylistic, rather than functional, conventions governing the development of software. A Google search for the phrase "c# guide style OR conventions" returned 1.83 million search results on October 26, 2016. Top results include coding style guides or conventions published by Microsoft, academic institutions, private individuals, and companies. There is no one "correct" style guide, but consistent stylistic practices throughout an organization, or at least a specific solution, increase code comprehension and consequently decrease the rate and significance of software defects[17].

I found no references to coding conventions or style guides in the FST solution or FST Validation materials. Upon inspection of the FST source code, disparate coding styles are indicated.  Without explicit descriptions of intended behaviors, reviewers and developers are left to infer the purpose of the code from its own function. In the absence of

---

[16] "C# Coding Conventions (C# Programming Guide)" (Microsoft Developer Network. Available at - https://msdn.microsoft.com/en-us/library/ff926074.aspx)
[17] Defect: "a problem which, if not corrected, could cause an application to either fail or to produce incorrect results" (ISO/IEC/IEEE, "Systems and software engineering -- Vocabulary," ISO/IEC/IEEE 24765:2010(E), vol. 2010.)

external definitions of intended functionality, a developer runs the risk of justifying the behavior of existing code by its sheer existence. See also [5.2 Testing].

### 5.4.3.2  Code smells

Martin Fowler describes code smells as, "A code smell is a surface indication that usually corresponds to a deeper problem in the system."[18] In this sense, a *smell* is not a defect in itself but is a deviation from good coding practices, which can indicate underlying software defects. Coding conventions and style guides purposely prevent code smells. Coding practices such as writing long routines[19] or complex classes[20] can obfuscate underlying issues due to the difficulty of comprehending large segments of code.



---

[18] Fowler, M. "CodeSmell". Available at - http://martinfowler.com/bliki/CodeSmell.html
[19] Routine: "a subprogram that is called by other programs and subprograms" (ISO/IEC/IEEE, "Systems and software engineering -- Vocabulary," ISO/IEC/IEEE 24765:2010(E), vol. 2010.)
[20] Class: "1. an abstraction of the knowledge and behavior of a set of similar things. 2. a static programming entity in an object-oriented program that contains a combination of functionality and data. Syn: type NOTE Classes are used to represent the notion of 'things whose knowledge or actions are relevant'." (ISO/IEC/IEEE, "Systems and software engineering -- Vocabulary," ISO/IEC/IEEE 24765:2010(E), vol. 2010.)
[21] Magic number: "literal value that is used by a program directly rather than being embedded in a named constant or variable" (ISO/IEC/IEEE, "Systems and software engineering -- Vocabulary," ISO/IEC/IEEE 24765:2010(E), vol. 2010.)

### 5.4.3.3  Comments

Comments provide annotations for developers to reference but do not affect the functional behavior of the source code. Comments can be generated manually by developers or automatically by a development environment (e.g. Visual Studio). In the C# language, lines preceded by a double-slash ("//") are not translated to machine code and can therefore serve as non-functional annotations of the code. Similarly, lines of old or deprecated code can be prepended with a "//" to remove from the functional body of code – this is often observed during the development stage of a software program.

Other large sections of code are entirely "commented-out," indicating a change in requirements or implementation of that section of code. Reasons for maintaining "commented-out" code rather than deleting it are future reference, future re-implementation, use of the code as a test during development, or simply untidy maintenance practices.



Excessive comments detract from the readability of the code, in this case, doubling the length of the code segment. Excessive comments increase maintenance time costs and complexity, as code modified during the normal development cycle or as a bug fix must be accompanied with any needed changes to the comments describing the code's intended (modified) behavior.

### 5.4.4   Version control

IEEE defines "version control" as, "establishment and maintenance of baselines and the identification and control of changes to baselines that make it possible to return to the previous baseline"[22]. Normally, when a file is saved to a hard drive, the previous version of the file is overwritten by the new version, permanently discarding any previous information contained therein. Version control systems allow for iterative changes to be made to all files in the system, which in turn emphasizes code ownership and allows for modifications to be tracked.



---

[22] ISO/IEC/IEEE, "Systems and software engineering -- Vocabulary," ISO/IEC/IEEE 24765:2010(E), vol. 2010.

███████████████████████████████████████████████████
████████████████

### 5.4.5  Dead code

As described by Debray, et al[23], "dead code refers to computations whose results are never used." Visual Studio provides basic detection of dead code upon attempting to build a solution.

███████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
██████████████████████████████████

## 5.5  FST Database

### 5.5.1  Empty tables

███████████████████████████████████████████████████
███████████████████████████████████████████████████
████████████████████████████████    I do not know if entries in these tables exist in OCME's version of the database but were removed before the database backup was made for provision in this case; if I was provided a "test" or "developmental" database backup; or if these tables are also empty in the FST build used by OCME for casework.

### 5.5.2  "CaseTypes" table and "ComparisonData.cs"

███████████████████████████████████████████████████
████████████████████

---

[23] Debray, S. K., Evans, W., Muth, R., & De Sutter, B. (2000). Compiler techniques for code compaction. ACM Transactions on Programming Languages and Systems (TOPLAS), 22(2), 378–415.

[24] Package: "a separately compilable software component consisting of related data types, data objects, and subprograms" (ISO/IEC/IEEE, "Systems and software engineering -- Vocabulary," ISO/IEC/IEEE 24765:2010(E), vol. 2010.)







It is unclear to me why this aberrant behavior occurs or if this behavior of FST is also observed by FST users at OCME during casework analysis.

## 5.6  Undocumented behavior

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

██████████

████████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████

██████████████████████████████████

During this review, I encountered no notice, either intended or actual, provided to the user of FST that any loci were removed from the likelihood ratio calculation. I found no indication that this behavior is intended during my examination of FST-related publications and the FST Validation materials. Testing I performed [see Appendix D – Single-locus Testing] indicates that this behavior is real. Equivalent locus likelihood ratios of "1" were reported for single-locus tests, regardless of whether the "comparison" (reference) profile shared alleles with the evidentiary item or not, as long as the sum of allele frequencies was ████████ at that locus.

It is unclear from this review how often this is encountered during casework; whether an FST user is aware that a locus is ignored when it ignored by the FST software; or how this has affected or can affect casework mixture analysis and reporting. I am not aware of any studies conducted on this feature's impact on casework samples and the calculation of their statistical weights reported by OCME.

Such departures from the published descriptions of FST's behavior during its actual operation raise the question if additional undocumented behaviors, either intended or actual, affect casework samples during the operation of the FST software or the reporting of its likelihood ratio results.

# 6  Conclusion

This review should not be considered complete, comprehensive, or exhaustive. I am available to continue reviewing the materials I have been provided or to review additional materials previously not provided.

I am ultimately unsure if the materials provided to me are the same materials that were used while conducting the study documented in the FST Validation materials or casework analyses in the case US v. Johnson.

Reviewing the materials I was provided, I did not leave with the impression that FST was developed by an experienced software development team, especially in regards to adherence to coding conventions, use of general software development standards, or even basic good practices such as using consistent coding styles; attributing authorship to code segments; or writing automated software tests.

The presence of undocumented behaviors and differences in appearance between the version I reviewed and the version shown in the FST Validation materials calls into question when development on FST ceased and how this affects or might affect the significance of any scientific conclusions predicated on FST Validation materials.

Given the lack of a set of detailed and explicit software requirements and specifications, it is difficult to evaluate to what extent FST's testing reflects rigorous and appropriate software testing. Consequently, the idea that FST is a "validated" software program should be revisited and a more thorough review conducted.

Given the materials I was provided, the time I was able to review them, and the issues I identified, I recommend that:

1. Explicit requirements and specifications of the intended (not necessarily extant) behaviors be written such that no undocumented or unexpected behaviors exist and against which software testing of FST can be conducted.
2. A formal software test plan be written and described in terms of coverage.
3. Software tests needed for validation be written as automated tests that can be executed and reported on by an automated software testing framework.
4. The FST Validation materials and publications regarding FST be compared to the validated version of FST, with any discrepancies noted.

Until these steps are followed, the correctness of the behavior of the FST software should be seriously questioned.

Signed,

*[signature]*

October 27, 2016

# Appendix A – Refactoring

I made modifications to the database, application configurations, and code in order to assemble a working FST client-server system on my local PC's.

## A.1 Databases

Aside from the modifications described below, I made no further changes to the FST databases I was provided.

### A.1.1  Restoration of backups

███████████████████████████████████████████████████████

███████████████████████████████

### A.1.2  Database security

The restored databases contained user profiles and logins with security identifiers (SIDs) that I was not provided. I was able to insert a new user into each database with full privileges to bypass the need for transferring or replicating existing SIDs.

## A.2 Application configurations

Aside from the modifications described below, I made no further changes to FST's application configuration.

### A.2.1  .NET packages



### A.2.2  Database connections

The FST solution has multiple references to a database server. These references are server-specific, so they had to be regenerated by my server and specified in multiple configuration files to point to my local server.

### A.2.3 Project properties

████████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

### A.2.4 ██████████████

█████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████

████████████████████████

# A.3 Code modifications

Aside from the modifications described below, I made no changes to the FST solution's source code.

### A.3.1 Secure login

█████████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████

███████████████████████████████████████████

██████████████████████████████

# Appendix B – FST Interface



Figure B.1 – Login screen for FST.



Figure B.2 – Homepage for new analysis.



Figure B.3 – Available "case types" dropdown menu on homepage for new analysis.



Figure B.4 - FST error page.

# Appendix C – US v. Johnson reproductions



*Figure C.1 - Replicate 1 for "back strap and grips # 2"*



*Figure C.2 - Replicate 2 for "back strap and grips # 2"*



*Figure C.3 - Comparison profile for "back strap and grips # 2"*

Identifiler

**Forensic Statistic Comparison Report**

v2.5

| FB#1: FST report replicate | FB#2: | Item: swab of "front/back strap and grips # 2" | Comparison: Kevin Johnson test | DNA Template Amount (pg): 175 | Input By: admin |

Hp: Kevin Johnson test (Comparison) + 2 Unknowns   Hd: 3 Unknowns

Deducible: No

**Profiles**



| | Profile | D8S1179 | D21S11 | D7S820 | CSF1PO | D3S1358 | TH01 | D13S317 | D16S539 | D2S1338 | D19S433 | vWA | TPOX | D18S51 | D5S818 | FGA |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Kevin Johnson test (Comparison) | | | | | | | | | | | | | | | | |
| Evidence | | | | | | | | | | | | | | | | |
| | 1 | 12, 13, 14, 15, 16, 17 | 27, 28, 30, 31 | 10, 12 | 9, 10, 12 | 14, 15, 16, 17 | 6, 7, 9 | 11, 12 | 9, 11, 13 | 18, 19, 21 | 14, 15, 15.2 | 15, 16 | 6, 8 | 15 | 11, 12, 13 | |
| | 2 | 13, 14, 15, 16, 17 | 27, 28, 30, 31 | 8, 12 | 12 | 14, 15, 16 | 6, 7, 9 | 11, 12 | 11, 12, 13 | 18, 19 | 11, 13, 14, 15, 15.2, 16.2 | 16, 17 | 8, 9 | 18, 21 | 11, 13 | 22 |
| | 3 | | | | | | | | | | | | | | | |

**Comparison Result**

| | Asian | Black | Caucasian | Hispanic |
|---|---|---|---|---|
| Likelihood Ratio | 9.27e+08 | 1.39e+08 | 6.6e+07 | 2.04e+08 |

10/24/2016 4:36:54 PM

*Figure C.4 - FST report reproducing results for "back strap and grips # 2"*



*Figure C.5 - "Debug out" file for Caucasian subpopulation for "back strap and grips # 2" FST analysis*



*Figure C.6 - Replicate 1 for "slide grip grooves and mag release"*



*Figure C.7 - Replicate 2 for "slide grip grooves and mag release"*



*Figure C.8 - Comparison profile for "slide grip grooves and mag release"*



*Figure C.9 - FST reproducing results for "slide grip grooves and mag release"*

*Figure C.10 - "Debug out" for Caucasian subpopulation for "slide grip grooves and mag release" FST analysis*

# Appendix D – Single-locus Testing



*Figure D.1 - Replicate 1 for CSF testing where comparison alleles are observed in the replicate*



*Figure D.2 - Comparison for CSF testing where comparison alleles are observed in the replicate*



*Figure D.3 - FST results for CSF testing where comparison alleles are observed in the replicate*



*Figure D.4 - "Debug out" data for Asian subpopulation for CSF testing where comparison alleles are observed in the replicate *Note no other "Debug out" files were produced for this analysis*



*Figure D.5 - Replicate 1 for CSF testing where comparison alleles are <u>not</u> observed in the replicate*



*Figure D.6 - Comparison for CSF testing where comparison alleles are <u>not</u> observed in the replicate*



Identifiler

# Forensic Statistic Comparison Report

v2.5

| FB#1: | FB#2: | Item: | Comparison: CSF single-locus test | DNA Template Amount (pg): 100 | Input By: admin |
|---|---|---|---|---|---|

Hp: CSF single-locus test (Comparison) + 2 Unknowns

Hd: 3 Unknowns

Deducible: No

## Profiles

| | Profile | D8S1179 | D21S11 | D7S820 | CSF1PO | D3S1358 | TH01 | D13S317 | D16S539 | D2S1338 | D19S433 | vWA | TPOX | D18S51 | D5S818 | FGA |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **CSF single-locus test (Comparison)** | | | | | | | | | | | | | | | | |
| | | | | | 8,8 | | | | | | | | | | | |
| **Evidence** | | | | | | | | | | | | | | | | |
| | 1 | | | | 9, 10, 11, 12, 13, 14 | | | | | | | | | | | |
| | 2 | | | | | | | | | | | | | | | |
| | 3 | | | | | | | | | | | | | | | |

## Comparison Result

| | Asian | Black | Caucasian | Hispanic |
|---|---|---|---|---|
| Likelihood Ratio | 1 | 1 | 1 | 1 |

10/24/2016 7:26:12 PM

*Figure D.7 - FST results for CSF testing where comparison alleles are <u>not</u> observed in the replicate*



*Figure D.8 - "Debug out" data for Asian subpopulation for CSF testing where comparison alleles are __not__ observed in the replicate*
*Note no other "Debug out" files were produced for this analysis*

# Curriculum Vitae

| | |
|---|---|
| **Name:** | Nathaniel D. Adams |
| **Current employer:** | Forensic Bioinformatic Services, Inc. |
| **Address:** | 2850 Presidential Drive, Suite 160<br>Fairborn, OH 45324 USA |
| **Phone:** | +1 (937) 426-9270 (office) |
| **Email:** | Adams.201@Wright.edu<br>Adams@Bioforensics.com |
| **Present position:** | Systems Engineer |
| **Current duties:** | Operating custom and commercial software for independent review of forensic STR DNA analysis; reviewing materials generated during the course of STR DNA testing; performing data analysis for research and case work; and reviewing current scientific and industry literature. |
| **Educational background:** | **B.S.** Computer Science<br>Wright State University<br>Fairborn, OH<br><br>**M.S.** Computer Science, in progress, 2014-present<br>Wright State University<br>Fairborn, OH |
| **Professional experience:** | Systems Engineer<br>Forensic Bioinformatic Services, Inc.<br>Fairborn, OH<br>2012 – present |
| **Presentations:** | N. Adams. The Science and the State of Probabilistic Genotyping. Questioning Forensics: Inside the Black Box. The Legal Aid Society. October 28, 2016.<br><br>N. Adams. Weka in Java: Classification and Clustering. Data Science and Security Cluster, Wright State University. September 2, 2016. Fairborn, OH. |

N. Adams, D. Krane. Black Boxes and Due Process: Transparency in Expert Software Systems. 68th Annual Meeting of the American Academy of Forensic Sciences. February 26, 2016. Las Vegas, Nevada.

D. Krane, C. Rowland, N. Adams. Disputed DNA Stats for a Low-level Sample: A Case Study. 68th Annual Meeting of the American Academy of Forensic Sciences. February 26, 2016. Las Vegas, Nevada.

N. Adams, R. Chakraborty, C. Rowland, D. Krane. Complex Mixtures and the Minimum Number of Contributors: A Case Study (poster). 68th Annual Meeting of the American Academy of Forensic Sciences. February 26, 2016. Las Vegas, Nevada.

R. Koppl, D. Krane, N. Adams. Minimizing and Leveraging Bias in Forensic Science. National Institute of Standards and Technology International Symposium on Forensic Science Error Management. July 24, 2015. Washington, DC.

N. Adams. Is the Tail Wagging the Dog: Reviewing Probabilistic Genotyping Software. National Forensic College of National Academy of Criminal Defense Lawyers and Cardozo Law School. June 10, 2015. New York City, NY.

N. Adams. Introduction to Pattern Mining. Bioinformatics Research Group, Wright State University. March 24, 2015. Fairborn, OH.

S. Al-Awadi, M. Sabbaha, N. Adams, A. Marshall, C. Rowland, D. Krane. Pairwise Comparisons as a Means of Validating Iraqi Muslim and Christian Allele Frequency Databases (poster). 67th Annual Meeting of the American Academy of Forensic Sciences. February 19, 2015. Orlando, FL.

N. Adams, A. Marshall. The Science (and Pseudoscience) of DNA Profiling. The Kettering-Moraine Public Library. June 21, 2014. Kettering, OH.

N. Adams. Allele Frequencies: How the Same Statistic Varies and Why It Should. Forensic DNA for Trial Attorneys, Cook County Office of the Public Defender. May 30, 2014. Chicago, IL.

D. Krane, N. Adams. The Science (and Pseudoscience) of DNA Profiling. Wright State University Foundation Board of Trustees Meeting, Wright State University. October 24, 2013. Fairborn, OH.

N. Adams, A. Marshall. Forensic DNA Analysis. Bioinformatics Research Group, Wright State University. April 3, 2013. Fairborn, OH.

| | |
|---|---|
| **Continuing education:** | Questioning Forensics: Inside the Black Box. The Legal Aid Society. October, 2016. New York, NY. |
| | DNA and More: Developments in Forensic Science, Cook County Office of the Public Defender. June, 2016. Chicago, IL. |
| | 68th Annual Meeting of the American Academy of Forensic Sciences. February, 2016. Las Vegas, NV. |
| | National Institute of Standards and Technology International Symposium on Forensic Science Error Management. July, 2015. Washington, DC. |
| | National Forensic College of the National Academy of Criminal Defense Lawyers and Cardozo Law School. June, 2015. New York City, NY. |
| | Forensic Bias and Error: Causes and Correction, Cook County Office of the Public Defender. May, 2015. Chicago, IL. |
| | DNA Mixture Interpretation Software Workshop, Midwestern Association of Forensic Scientists. June, 2014. St. Louis, MO. |
| | 67th Annual Meeting of the American Academy of Forensic Sciences. February, 2015. Orlando, FL. |
| | Science in the Courtroom for the 21st Century: Current Issues in DNA Litigation. Cook County Office of the Public Defender. May, 2013. Chicago, IL. |
| **Professional organizations:** | Institute of Electrical and Electronics Engineers. Student member. |
| | Association for Computing Machinery. Student member. |
| **Testimony:** | State v. Emanuel Fair. King County Superior Court, Seattle, WA. Pretrial hearing on probabilistic genotyping. |
| **Student organizations and recognition:** | Data Science and Security Cluster, 2015-present. Wright State University, Fairborn, OH. |
| | Bioinformatics Research Group, 2012-present. Wright State University, Fairborn, OH. |
| | Dean's Leadership Institute, 2013-2014. College of Engineering and Computer Science. Wright State University, Fairborn, OH. |
| | College Award for Senior Design, College of Engineering and Computer Science, May, 2014. Wright State University, Fairborn, OH. |
| | Choose Ohio First Scholarship |

3

Recognition for Excellence in Service-Learning, 2013. Wright State University, Fairborn, OH.

Lockheed Martin Scholarship