UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA,                          :

                                                  :          15 Cr. 565 (VEC)

                   - v. –

                                                  :

KEVIN JOHNSON,

                                                  :

                           Defendant.

                                                  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


**MEMORANDUM IN SUPPORT OF APPLICATION BY
PROPUBLICA FOR LEAVE TO INTERVENE, LIFT THE
<u>PROTECTIVE ORDER AND UNSEAL JUDICIAL RECORDS</u>**


MEDIA FREEDOM AND INFORMATION
ACCESS CLINIC

David A. Schulz
321 W. 44th Street, Suite 1000
New York, NY 10036
(212) 850-6103

Hannah Bloch-Wehba (application for admission
     *pro hac vice* forthcoming)
P.O. Box 208215
New Haven, CT 06520
(203) 436-5824

*Counsel for Pro Publica, Inc.*

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................ 1

FACTUAL AND PROCEDURAL BACKGROUND ................................................ 3

A.   The Reliability and Integrity of the FST is a
     Matter of Substantial Controversy and Public Concern ...................................... 3

B.   Concerns About The Reliability of the FST Were at the Core of This Case ..................... 7

ARGUMENT ................................................................................................... 8

I.    THE COURT SHOULD PERMIT PROPUBLICA TO
      INTERVENE FOR THE LIMITED PURPOSE OF LIFTING
      THE PROTECTIVE ORDER GOVERNING THE FST SOURCE CODE ..................... 8

II.   THE COURT SHOULD EXERCISE ITS DISCRETION
      TO VACATE OR MODIFY THE PROTECTIVE ORDER ........................................... 9

      A.    Protective Orders Require Good Cause. ................................................ 9

      B.    OCME Cannot Meet Its Burden To Justify Continued Confidentiality. .............. 11

            1.    The public has a substantial interest
                  in disclosure of the FST source code. ...................................... 12

            2.    OCME would not be injured by disclosure of the code. ........................... 13

C.    There Is No Sound Basis To Continue The Protective Order .......................................... 16

      1.    OCME did not reasonably rely on the protective order. ........................... 16

      2.    There is both a compelling need and extraordinary circumstances
            requiring disclosure of the FST source code ............................................. 18

III.  THE REDACTED PORTIONS OF NATHANIEL
      ADAMS' DECLARATION SHOULD BE UNSEALED ................................................ 19

IV.   PROPUBLICA HAS A FIRST AMENDMENT
      RIGHT TO RECEIVE THE FST SOURCE CODE ......................................................... 20

      A.    ProPublica Has Standing to Challenge the Order. ................................................ 20

      B.    The Protective Order Restricts ProPublica's
            First Amendment Right To Receive Information .................................................. 21

V.      THIS COURT SHOULD STAY THE REQUIREMENT THAT
        DEFENSE COUNSEL RETURN THE SOURCE CODE BY OCTOBER 12, 2017 ...... 23

CONCLUSION ........................................................................................................................... 24

## TABLE OF AUTHORITIES

**Cases**

*ABC, Inc. v. Stewart*,
  360 F.3d 90 (2d Cir. 2004) ................................................................... 23

*Anderson v. Cryovac, Inc.*,
  805 F.2d 1 (1st Cir. 1986) .................................................................... 25

*Bank of New York v. Meridien BIAO Bank Tanz., Ltd.*,
  171 F.R.D. 135 (S.D.N.Y. 1997) ......................................................... 16

*Bayer AG & Miles, Inc. v. Barr Labs., Inc.*,
  162 F.R.D. 456 (S.D.N.Y. 1995) ......................................................... 13

*CBS Inc. v. Davis*,
  510 U.S. 1315 (1994) ........................................................................... 26

*Chembio Diagnostic Sys., Inc. v. Saliva Diagnostic Sys., Inc.*,
  236 F.R.D. 129 (E.D.N.Y. 2006) ......................................................... 16

*City of Hartford v. Chase*,
  733 F. Supp. 533 (D. Conn. 1990),
  *rev'd on other grounds*, 942 F.2d 130 (2d Cir. 1991) ........................... 13, 14, 19, 20

*Daniels v. City of New York*,
  200 F.R.D. 205 (S.D.N.Y. 2001) ......................................................... 10, 13

*Dist. Attorney's Office for the Third Judicial Dist. v. Osborne*,
  557 U.S. 52 (2009) ................................................................................. 2

*Fournier v. Erickson*,
  242 F. Supp. 2d 318 (S.D.N.Y. 2003) ................................................. 20

*Gambale v. Deutsche Bank AG*,
  377 F.3d 133 (2d Cir. 2004) ................................................................ 13

*Geller v. Branic Int'l Realty Corp.*,
  212 F.3d 734 (2d Cir. 2000). .............................................................. 19

*Grayson v. Gen. Elec. Co.*, No. 3:13CV1799 (WWE),
  2017 WL 923907 (D. Conn. Mar. 7, 2017) .......................................... 17

*Hasbrouck v. BankAmerica Hous. Servs.*,
  187 F.R.D. 453 (N.D.N.Y. 1999), *aff'd sub nom.*
  *Hasbrouck v. BankAmerica Hous. Servs., Inc.*, 190 F.R.D. 42 (N.D.N.Y. 1999) ........ 11

*In re Agent Orange Prod. Liab. Litig.*,
    104 F.R.D. 559 (E.D.N.Y.1985), *aff'd on other grounds*,
    821 F.2d 139 (2d Cir.1987) ........................................................................ 12, 13, 14, 21

*In re Application of Dow Jones & Co., Inc.*,
    842 F.2d 603 (2d Cir. 1988) ........................................................................ 10, 24

*In re EPDM Antitrust Litig.*,
    255 F.R.D. 308 (D. Conn. 2009) ................................................................ 19, 20

*In re Herald Co.*,
    734 F.2d 93 (2d Cir.1984) ............................................................................ 9

*In re Parmalat Sec. Litig,.*
    258 F.R.D. 236 (S.D.N.Y. 2009) ................................................................ 16, 17

*In re Terrorist Attacks on September 11, 2001*,
    454 F. Supp. 2d 220 (S.D.N.Y.2006) ........................................................ 11

*In re Zyprexa Injunction*,
    474 F. Supp. 2d 385 (E.D.N.Y. 2007) ........................................................ 10

*Int'l Equity Invs., Inc. v. Opportunity Equity Partners Ltd.*,
    No. 05 CIV. 2745 (JGK)(RLE), 2010 WL 779314 (S.D.N.Y. Mar. 2, 2010) ........................ 20

*Kleindienst v. Mandel*,
    408 U.S. 753 (1972) .................................................................................... 10

*Landis v. N. Am. Co.*,
    299 U.S. 248 (1936) .................................................................................... 27

*Littlejohn v. Bic Corp.*,
    851 F.2d 673 (3d Cir. 1988) ........................................................................ 17

*Lugosch v. Pyramid Co. of Onondaga*,
    435 F.3d 110 (2d Cir. 2006) ........................................................................ 23

*Martindell v. Int'l Tel. & Tel. Corp.*,
    594 F.2d 291 (2d Cir. 1979) ........................................................................ 19

*Nebraska Press Ass'n v. Stuart*,
    427 U.S. 539 (1976) .................................................................................... 26

*New York Times Co. v. Biaggi*,
    828 F.2d 110 (2d Cir. 1987) ........................................................................ 23

*Nielsen Co. (U.S.), LLC v. Success Sys., Inc.*,
    112 F. Supp. 3d 83 (S.D.N.Y. 2015) ............................................................ 19, 21

iv

*North Atlantic Instruments, Inc. v. Haber,*
  188 F.3d 38 (2d Cir. 1999) ................................................................... 16

*Pansy v. Borough of Stroudsburg,*
  23 F.3d 772 (3d Cir. 1994) ............................................................. 11, 12

*People v. Belle,*
  47 Misc. 3d 1218(A) (Sup. Ct. N.Y. County 2015) ................................... 4

*People v. Carter,*
  50 Misc. 3d 1210(A) (Sup. Ct. N.Y. County 2016) ................................... 4

*People v. Collins,*
  49 Misc. 3d 595, 621 (Sup. Ct. N.Y. County. 2015) ..................... 4, 14, 22

*People v. Megnath,*
  27 Misc. 3d 405 (Sup. Ct. N.Y. County 2010) ...................................... 14

*People v. Rodriguez,*
  153 A.D.3d 235 (App. Div. [1st Dep't] 2017) ......................................... 4

*Press-Enter. Co. v. Superior Court,*
  478 U.S. 1 (1986) ................................................................................ 24

*Public Citizen v. Liggett Grp., Inc.,*
  858 F.2d 775 (1st Cir. 1988) ............................................................... 25

*Rofail v. United States,*
  227 F.R.D. 53 (E.D.N.Y. 2005) ........................................................... 11

*S.E.C. v. TheStreet.Com,*
  273 F.3d 222 (2d Cir. 2001) ............................................... 12, 19, 20, 21

*Scripps-Howard Radio v. F.C.C.,*
  316 U.S. 4 (1942) ................................................................................ 27

*Seattle Times Co. v. Rhinehart,*
  467 U.S. 20 (1984)) ...................................................................... 25, 26

*Softel, Inc. v. Dragon Med. & Sci. Commc'ns, Inc.,*
  118 F.3d 955 (2d Cir. 1997) ............................................................... 16

*Stajic v. City of New York,*
  No. 1:16-cv-01258 (S.D.N.Y. filed Feb. 18, 2016) ................................. 4

*United States v. Amodeo,*
  71 F.3d 1044 (2d Cir. 1995) ............................................................... 23

*United States v. Aref*,
   533 F.3d 72 (2d Cir. 2008) ........................................................................... 9

*United States v. Jones*,
   No. 3:06-CR-149, 2007 WL 4404682 (E.D. Tenn. Dec. 13, 2007)......................... 12

*United States v. Kerik*,
   No. 07 CR 1027 (LAP), 2014 WL 12710346 (S.D.N.Y. July 23, 2014)................... 12

*United States v. Salameh*,
   992 F.2d 445 (2d Cir. 1993) ........................................................................ 26

*United States v. Smith*,
   985 F. Supp. 2d 506 (S.D.N.Y. 2013) ......................................................... 11, 12

*United States v. Wecht*,
   484 F.3d 194 (3d Cir. 2007) ......................................................................... 3

*Univ. of Texas v. Camenisch*,
   451 U.S. 390 (1981)................................................................................... 27

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*,
   425 U.S. 748 (1976)................................................................................... 26

*Virginian Ry. v. United States*,
   272 U.S. 658 (1926)................................................................................... 27

**Other Authorities**

Adam Liptak, *Houston DNA Review Clears Convicted Rapist,
   and Ripples in Texas Could Be Vast*, The New York Times (Mar. 11, 2003)........................... 6

Arthur R. Miller, *Confidentiality, Protective Orders, and Public
   Access to the Courts*, 105 Harv. L. Rev. 427 (1991) ............................................... 10

Brian Rogers, *Scores of Cases Affected After HPD Crime Lab Analyst
   Ousted*, Houston Chronicle (June 18, 2014, 2:10 PM)............................................. 6

Catherine Leahy Scott, *Investigation into the New York City Office of
   Chief Medical Examiner: Department of Forensic Biology*, New York State
   Office of the Inspector General (Dec. 2013) ....................................................... 2

David S. Levine, *The People's Trade Secrets?* 18 Mich.
   Telecomm. & Tech. L. Rev. 61 (2011)............................................................. 15

Eric Dexheimer, *Austin Crime Lab Bucked DNA Standard For Years, Yet
   Got Passing Grades*, Austin-American Statesman (Jan. 12, 2017)........................... 19

Erin E. Murphy, *Inside the Cell: The Dark Side of Forensic DNA* (2015)................................. 19

Julia Angwin, Jeff Larson, Surya Mattu, and Lauren Kirchner, *Machine Bias*,
  ProPublica (May 23, 2016) ........................................................................................... 1

Keith L. Alexander, *National Accreditation Board Suspends
  All DNA Testing at D.C. Crime Lab*, Wash. Post (Apr. 27, 2015) ............................. 5

Lauren Kirchner, *Thousands of Criminal Cases in
  New York Relied on Disputed DNA Testing Techniques*,
  ProPublica (Sept. 4, 2017) ......................................................................... 3, 5, 14, 18

Matthew Shaer, *The False Promise of DNA Testing*, The Atlantic (June 2016) .................. 5, 6, 19

*Misapplication of Forensic Science*, The Innocence Project ......................................... 4

Ryan Gabrielson, *Another Startling Verdict for Forensic Science*,
  ProPublica (Apr. 14, 2017) .................................................................................. 1, 19

Ryan Gabrielson, *Houston Police End Use of Drug Tests that Helped Produce Wrongful
  Convictions*, ProPublica (July 14, 2017) ................................................................. 1

Tony Plohetski, *Austin Police DNA Lab Closed Amid Forensics Commission's Concerns*,
  Austin-American Statesman (June 10, 2016) ............................................................ 5

## PRELIMINARY STATEMENT

This application is brought by Pro Publica, Inc. ("ProPublica") to obtain access to a governmental record of significant public interest that is unavailable due to an order of this Court in the underlying proceeding.

ProPublica is an independent, non-profit, online newsroom that conducts investigative reporting on matters of public concern, and regularly reports on the criminal justice system. Its staff of full-time investigative reporters have covered such issues as the value of drug tests used by the Houston police, the reliability of hair analysis tests, and computer algorithms used in risk assessments of defendants.[1] ProPublica's reporting is often published in conjunction with other news organizations, including the *New York Times*, the *Los Angeles Times*, the *New Yorker*, *NPR*, and the *New York Daily News*. ProPublica has won four Pulitzer Prizes since its founding in 2007.

In this matter, ProPublica seeks to vacate the protective order that currently bars defense counsel and retained experts from disclosing the source code for the Forensic Statistical Tool ("FST"). The FST software was developed by the New York Office of the Chief Medical Examiner ("OCME"), one of the largest forensic laboratories in the United States. FST relies upon probabilistic genotyping to "match" DNA samples to specific individuals. The program

---

[1] Ryan Gabrielson, *Houston Police End Use of Drug Tests that Helped Produce Wrongful Convictions*, ProPublica (July 14, 2017), https://www.propublica.org/article/houston-police-end-drug-tests-that-helped-produce-wrongful-convictions, *annexed as* Ex. A to Declaration of Hannah Bloch-Wehba ("Bloch-Wehba Decl."); Ryan Gabrielson, *Another Startling Verdict for Forensic Science*, ProPublica (Apr. 14, 2017), https://www.propublica.org/article/another-startling-verdict-for-forensic-science-1, *annexed as* Ex. B to Bloch-Wehba Decl.; Julia Angwin, Jeff Larson, Surya Mattu, and Lauren Kirchner, *Machine Bias*, ProPublica (May 23, 2016), https://www.propublica.org/article/machine-bias-risk-assessments-in-criminal-sentencing, *annexed as* Ex. C to Bloch-Wehba Decl.

generates a "likelihood ratio" that measures the probability that a given DNA profile is present in a mixture of DNA.  The program has been used by OCME since April 2011.[2]

Recognizing that access to the FST source code was essential for defendant Kevin Johnson to mount an effective defense, this Court ordered the code disclosed to Mr. Johnson's expert.  Dkt. 57; Dkt. 67.  Yet the OCME insisted on the imposition of a broad protective order that designates the FST source code as "highly confidential material" and prevents both defense counsel and the retained experts from sharing either the code, or their specific findings regarding that code.  Dkt. 69.

Precisely because the FST may have "potentially devastating" effects in the criminal justice system, Dkt. 57, the public has a compelling need to know how the program operates. How the program functions is a matter of the utmost public concern.  DNA evidence is "unlike anything known before" and can be both exculpatory and inculpatory; it "has exonerated wrongly convicted people, and has confirmed the convictions of many others."[3]

Only by gaining access to the FST source code can the public meaningfully understand how this powerful technology functions and its reliability.  In light of the profound importance of this technology to the integrity of the criminal justice system, and the overriding public interest in transparency, this Court should vacate the protective order and unseal Nathaniel Adams' expert declaration, Dkt 99, Ex. C.

---

[2] Catherine Leahy Scott, *Investigation into the New York City Office of Chief Medical Examiner: Department of Forensic Biology*, New York State Office of the Inspector General (Dec. 2013), https://www.ig.ny.gov/sites/default/files/pdfs/OCMEFinalReport.pdf, *annexed as* Ex. D to Bloch-Wehba Decl.

[3] *Dist. Attorney's Office for the Third Judicial Dist. v. Osborne*, 557 U.S. 52, 62 (2009).

## FACTUAL AND PROCEDURAL BACKGROUND

**A.**    **The Reliability and Integrity of the FST is a**
**Matter of Substantial Controversy and Public Concern**

"The process by which the government investigates and prosecutes its citizens is an important matter of public concern." *United States v. Wecht*, 484 F.3d 194, 210 (3d Cir. 2007). The issues raised here—alleged faults in the implementation of a highly criticized forensic analysis program, and the attempt to shield that program from public scrutiny—lie at the very core of this area of public concern.

The use of the FST software has come under fire in recent years.  On September 4, 2017, ProPublica and the New York Times published a lengthy investigation of OCME's use of the FST in DNA testing.[4]  A "former member of the New York State Commission on Forensic Science said he had been wrong when he approved the use" of FST, while an expert witness who examined the source code concluded that "its accuracy 'should be seriously questioned.'"  *Id.* Over the past six years, however, OCME estimates that it has used the FST in 1,350 cases.  *Id.*

The FST works by computing a likelihood ratio which measures whether it is more or less likely that a known suspect contributed DNA to a mixture than an unknown person.  *Id.* State courts have disagreed as to whether the FST is generally accepted in the relevant scientific community such that testimony regarding the FST is admissible.  *Compare People v. Collins*, 49 Misc. 3d 595, 621 (Sup. Ct. N.Y. County 2015) ("The FST is not generally accepted in the DNA scientific community."), *with People v. Carter*, 50 Misc. 3d 1210(A) (Sup. Ct. N.Y. County

---

[4] Lauren Kirchner, *Thousands of Criminal Cases in New York Relied on Disputed DNA Testing Techniques*, ProPublica (Sept. 4, 2017), https://www.propublica.org/article/thousands-of-criminal-cases-in-new-york-relied-on-disputed-dna-testing-techniques, *annexed as* Ex. E to Bloch-Wehba Decl.

2016), *People v. Rodriguez*, 153 A.D.3d 235 (App. Div. [1st Dep't] 2017), *and People v. Belle*, 47 Misc. 3d 1218(A) (Sup. Ct. N.Y. County 2015) (allowing FST evidence).

Federal, state, and city officials have trained a critical eye on the FST.  In *Collins*, the defense experts who concluded that the FST is flawed included Dr. Bruce Budowle, "the father of American DNA analysis" and a sixteen-year veteran of the FBI DNA laboratory; Dr. Eli Shapiro, OCME's former Director of Training; and Dr. Ranajit Chakraborty, a former member of the New York State DNA subcommittee that approved the FST in 2010.  Last year, Dr. Marina Stajic filed a civil lawsuit against the City of New York alleging that she had been unlawfully terminated from her position as Director of OCME's Forensic Toxicology Laboratory, partly in retaliation for appearing to raise questions about "low copy number" analytic methods.  Compl., *Stajic v. City of New York*, No. 1:16-cv-01258 (S.D.N.Y. Feb. 18, 2016), Dkt 1.

Whether the FST is sufficiently reliable to generate probative evidence remains in question today.  This is not an academic debate: errors in forensic science lead to the imprisonment of innocent people.[5]

In the case of the FST, it is not just the forensic science that is a matter of controversy, but also the programming code that determines how the FST operates. Even if the forensic science theory and methodology that underpins the FST is sound, one bad line of programming in a software program like the FST could render the results complete junk.  The FST program is a "black box:" "the data go in, and out comes the solution, and we're not fully informed of what

---

[5] *Misapplication of Forensic Science*, The Innocence Project, https://www.innocenceproject.org/causes/misapplication-forensic-science/, *annexed as* Ex. F to Bloch-Wehba Decl. (finding that in a study of over 350 post-conviction exonerations, almost half of wrongful convictions were based on improper forensic science at trial).

happened in between."[6]  A scientist at OCME, who remained anonymous in the ProPublica article out of fear of career repercussions, stated that "We don't know what's going on in that black box, and that is a legitimate question."  Kirchner, Bloch-Wehba Decl Ex. E.  The scientist added that "evidence in older cases should 'absolutely' be retested in light of growing cases about the FST."  *Id.*

Indeed, when the expert in this case, Nathaniel Adams, a computer scientist and engineer, reviewed the FST source code for the defense, he found significant problems and errors.  Mr. Adams found that "the program dropped valuable data from its calculations" in a way that "could unpredictably affect the likelihood assigned to the defendant's DNA being in the mixture."  *Id.* Mr. Adams concluded that "the correctness of the behavior of the FST software should be seriously questioned." Ex. C at 21, Dkt. 99.

Concerns over the validity of particular forensic analysis methods are an issue of vital public interest. In recent years, the use of flawed methods in analyzing DNA has led to the closure of DNA labs in Washington D.C. and in Austin.[7]

In 2003, after an audit of a DNA lab in Houston found poorly trained technicians misinterpreting data from contaminated samples and marking it down in shoddy records, "police and prosecutors vowed to retest DNA evidence in every case where it was used to obtain a

---

[6] Matthew Shaer, *The False Promise of DNA Testing*, The Atlantic (June 2016), https://www.theatlantic.com/magazine/archive/2016/06/a-reasonable-doubt/480747/, *annexed as* Ex. G to Bloch-Wehba Decl.

[7] Keith L. Alexander, *National Accreditation Board Suspends All DNA Testing at D.C. Crime Lab*, Wash. Post (Apr. 27, 2015), https://www.washingtonpost.com/local/crime/national-accreditation-board-suspends-all-dna-testing-at-district-lab/2015/04/26/2da43d9a-ec24-11e4-a55f-38924fca94f9_story.html, *annexed as* Ex. H to Bloch-Wehba Decl.; Tony Plohetski, *Austin Police DNA Lab Closed Amid Forensics Commission's Concerns*, Austin-American Statesman (June 10, 2016), http://www.mystatesman.com/news/austin-police-dna-lab-closed-amid-forensics-commission-concerns/rjbYwEnkci0IVy7LAPXVnM, *annexed as* Ex. I to Bloch-Wehba Decl.

conviction."[8]  The first wave of case files given to the district attorney's office included those of

seven death row inmates. *Id.* One man, Josiah Sutton, convicted at the age of 16 and sentenced to

25 years in prison for a rape the Houston lab claimed he committed, was exonerated after

retesting. Shaer, Bloch-Wehba Decl. Ex. G. In 2014, the same Houston lab, having reopened and

changed management, faced a high-profile scandal when an internal investigation revealed a lab

technician tampering with official records, among other things.[9]

That the FST source code has remained secret compounds the public concern regarding

its methodology.  When FST analysis arrives in a courtroom, it is the product of forensic science,

of computer programmers, and of lab technicians.  The historical record confirms that any fault

in the process of producing an analytic result—even an honest mistake or human error—can

result in the conviction of the innocent.

In light of the questions raised by many experts concerned about OCME's use of the

FST, the tool's use in more than a thousand criminal investigations presents serious concerns

about the validity of the convictions and guilty pleas that resulted. Without access to the source

code to determine how the program functions, assurances from OCME officials that the FST is a

reliable piece of software are simply glib promises.  The disclosure of the source code underlying

the FST is necessary for independent experts to audit the code and to reevaluate any convictions

or guilty pleas arising from its use.

---

[8] Adam Liptak, *Houston DNA Review Clears Convicted Rapist, and Ripples in Texas Could Be Vast*, The New York Times (Mar. 11, 2003), http://www.nytimes.com/2003/03/11/us/houston-dna-review-clears-convicted-rapist-and-ripples-in-texas-could-be-vast.html, *annexed as* Ex. J to Bloch-Wehba Decl.

[9] Brian Rogers, *Scores of Cases Affected After HPD Crime Lab Analyst Ousted*, Houston Chronicle (June 18, 2014, 2:10 PM), http://www.houstonchronicle.com/news/houston-texas/houston/article/Scores-of-cases-affected-after-HPD-Crime-Lab-5562835.php, *annexed as* Ex. K to Bloch-Wehba Decl.

**B.**     <u>Concerns About The Reliability of the FST Were at the Core of This Case</u>

In April 2015, Kevin Johnson was arrested by the police after a search of the apartment he was in resulted in the recovery of two guns. In testing the guns, the lab found that one gun contained the DNA of two individuals, while the second contained three. According to the prosecution in this case, the FST program calculated that it was 156 times more likely than not that the first gun contained Mr. Johnson's DNA.

Mr. Johnson requested access to the FST source code. The government refused, on the irrelevant ground that the FST source code was "a proprietary and copyrighted" tool owned by the City of New York.  Dkt 37.  This Court granted Mr. Johnson's request for a subpoena ordering OCME to produce the FST source code.  Dkt.  57.  Subsequently, OCME filed letter submissions detailing its objections to the subpoena, which Mr. Johnson responded to, and which the Court considered as a motion to quash the subpoena.  Dkts. 59, 61, 62, 63, 65, and 66.  In its final submission, OCME proposed that the defense expert could "review" the code, but not "possess" it.  Dkt. 66.

On July 6, 2016, the Court denied OCME's motion to quash, and ordered the parties to meet and confer regarding a protective order.  Dkt 67.  The Court emphatically rejected the "strict constraints" that OCME had proposed in its letter submissions as "draconian," and ordered that "Defendant's expert is entitled to possess the source code for purposes of conducting an analysis."  *Id.* at 2.  The parties met and conferred, without any notice to the media or the community of interested scientists, reached an agreement as to the terms of the protective order, and filed a signed protective order on Friday, July 15, 2016.  Dkt. 68.  On Monday, July 18, 2016, the Court approved the proposed protective order.  Dkt. 69.

Under the Order, the FST source code is designated as "Highly Confidential Material" that may not be disclosed to the public.  Dkt. 69.  The protective order requires the parties to

return the FST source code to the producing party within 30 days of the final disposition of the action—that is, by October 12, 2017.[10]  *Id.*

ProPublica now seeks to intervene in this action and asks this Court to vacate the protective order and to unseal the portions of the Declaration of Expert Witness Nathaniel Adams, Ex. C, Dkt. 99, that are redacted in the public file.  So as to permit orderly litigation and preserve the status quo, ProPublica also respectfully requests that this Court stay the order's requirement that the software be returned to OCME by October 12, 2017 while the Court considers the merits of this Application.

## ARGUMENT

### I.   THE COURT SHOULD PERMIT PROPUBLICA TO INTERVENE FOR THE LIMITED PURPOSE OF LIFTING THE PROTECTIVE ORDER GOVERNING THE FST SOURCE CODE

The Federal Rules of Criminal Procedure are silent on intervention.  The Second Circuit nevertheless has recognized that third parties may intervene in criminal cases to assert public rights of access.  *See United States v. Aref*, 533 F.3d 72, 81 (2d Cir. 2008) ("A motion to intervene to assert the public's First Amendment right of access to criminal proceedings is proper.").  In approving such interventions, the Second Circuit has explained that the vindication of access rights "requires some meaningful opportunity for protest by persons other than the initial litigants." *Id.* (quoting *In re Herald Co.*, 734 F.2d 93, 102 (2d Cir.1984)).

This same reasoning requires that a non-party may intervene in a criminal case for the limited purpose of lifting a protective order that bars access to records disclosed in a criminal prosecution.  This is particularly true in the present case, where the substantial public interest in disclosure of the source code is distinct from the defendant's own interest.  Here, moreover,

---

[10] Mr. Johnson was sentenced on August 29, 2017.  Dkt. 135.  His time to appeal his conviction lapsed on September 13, 2017.

ProPublica asserts a First Amendment right to the currently sealed information as a recipient of the abridged speech of a willing speaker.  *See infra* Part IV.  The First Amendment "necessarily protects the right to receive" information and ideas.  *Kleindienst v. Mandel*, 408 U.S. 753, 762-63 (1972) (internal quotations omitted).  Accordingly, this Court has held that "potential recipients of speech" may "challenge the abridgment of that speech."  *In re Application of Dow Jones & Co., Inc.*, 842 F.2d 603, 607 (2d Cir. 1988). Under *Dow Jones*, an individual has standing to intervene if he is "actually [a] potential receiver[] of otherwise restrained speech." *Id.*  ProPublica's intervention is therefore proper.

## II.     THE COURT SHOULD EXERCISE ITS DISCRETION TO VACATE OR MODIFY THE PROTECTIVE ORDER

### A.     Protective Orders Require Good Cause

Federal Rule of Criminal Procedure 16(d)(1) empowers courts to, "for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief."  Likewise, "the decision to modify a protective order is one committed to the sound discretion of the trial court." *Daniels v. City of New York*, 200 F.R.D. 205, 207 (S.D.N.Y. 2001).  Good cause is the "touchstone" of a court's power to issue protective orders while parties exchange discovery.  *In re Zyprexa Injunction*, 474 F. Supp. 2d 385, 415 (E.D.N.Y. 2007).  "Good cause exists when a party shows that disclosure will result in a 'clearly defined, specific and serious injury.'"  *United States v. Smith*, 985 F. Supp. 2d 506, 523 (S.D.N.Y. 2013) (quoting *In re Terrorist Attacks on September 11, 2001*, 454 F. Supp. 2d 220, 222 (S.D.N.Y.2006)).  Even when parties consent to a stipulated protective order, as they did here, "good cause remains the standard."  *Smith*, 985 F. Supp. 2d at 523 (citing *United States v. Luchko*, No. 06–CR–319, 2006 WL 3060985, at *3 (E.D.Pa. Oct. 27, 2006)).

"In considering whether good cause exists for a protective order, the federal courts have generally adopted a balancing process." *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 787 (3d Cir. 1994) (citing Arthur R. Miller, *Confidentiality, Protective Orders, and Public Access to the Courts*, 105 Harv. L. Rev. 427, 432–33 (1991)); *Rofail v. United States*, 227 F.R.D. 53, 55 (E.D.N.Y. 2005) ("[I]f the movant establishes good cause for protection, the court may balance the countervailing interests to determine whether to exercise discretion and grant the order.") (quoting *Hasbrouck v. BankAmerica Hous. Servs.*, 187 F.R.D. 453, 455 (N.D.N.Y. 1999), *aff'd sub nom. Hasbrouck v. BankAmerica Hous. Servs., Inc.*, 190 F.R.D. 42 (N.D.N.Y. 1999)).[11] In considering whether good cause exists to issue a protective order, courts take into account "whether a party benefitting from the order of confidentiality is a public entity or official. Similarly, the district court should consider whether the case involves issues important to the public." *Pansy*, 23 F.3d at 788; *see also S.E.C. v. TheStreet.Com*, 273 F.3d 222, 227 (2d Cir. 2001) (affirming district court's modification of a protective order on account of the public interest in the "interaction between the SEC and NYSE, two quasi-government agencies").

The effort by OCME, a government agency, to shield from scrutiny source code that was developed by New York City employees and paid for with taxpayer funds gives rise to the kind of public interest that weighs strongly against confidentiality. Courts have regularly recognized that such of public interest constitutes a significant "countervailing interest" in exercising discretion to grant or deny a protective order. *Rofail v. United States*, 227 F.R.D. at 55; *see also In re Agent Orange Prod. Liab. Litig.*, 821 F.2d 139, 148 (2d Cir. 1987) ("Any inconvenience to

---

[11] The standards for lifting protective orders on discovery developed and used in civil proceedings apply to criminal proceedings as well. *See United States v. Kerik*, No. 07 CR 1027 (LAP), 2014 WL 12710346, at *1 n.1 (S.D.N.Y. July 23, 2014); *Smith*, 985 F. Supp. 2d at 522 (citing *Gambale v. Deutsche Bank AG*, 377 F.3d 133, 142 (2d Cir.2004)); *United States v. Jones*, No. 3:06-CR-149, 2007 WL 4404682, at *1 (E.D. Tenn. Dec. 13, 2007) (acknowledging use of civil precedent when citing *Pansy*, 23 F.3d 772 at 786 (3d Cir.1994)).

which appellants are subjected certainly is outweighed by the enormous public interest"); *City of Hartford v. Chase*, 733 F. Supp. 533, 536 n. 5 (D. Conn. 1990), *rev'd on other grounds*, 942 F.2d 130 (2d Cir. 1991) ("Where the parties are private, the right to rely on confidentiality in their dealings is more compelling than where a government agency is involved, as the public has a countering interest in, and thus the claim of access to the conduct of public business by a governmental agency").

No good cause exists for continuing the protective order because OCME has not shown, and cannot show, a cognizable injury that would result from disclosure of the FST source code to the scientific community and the press in order to assess its validity and performance.

### B.  OCME Cannot Meet Its Burden To Justify Continued Confidentiality

"When a private party asserts a public interest in order to gain access to information" and moves to modify a protective order, the party seeking continued confidentiality bears the burden to demonstrate good cause.  *See Daniels*, 200 F.R.D. at 207 (citing *In re Agent Orange Prod. Liab. Litig.*, 104 F.R.D. 559, 567–68 (E.D.N.Y.1985), *aff'd on other grounds*, 821 F.2d 139 (2d Cir.1987)); *see also Bayer AG & Miles, Inc. v. Barr Labs., Inc.*, 162 F.R.D. 456, 462 (S.D.N.Y. 1995).

"[I]f good cause is not shown, the discovery materials in question should not receive judicial protection and therefore would be open to the public for inspection." *Gambale v. Deutsche Bank AG*, 377 F.3d 133, 142 (2d Cir. 2004) (internal quotation marks omitted). "It is undisputed that a district court retains the power to modify or lift protective orders that it has entered." *Id.*, 141 (quoting *In re Agent Orange Prod. Liab. Litig.*, 821 F.2d at 145) (internal quotation marks omitted).

1.     **The public has a substantial interest in disclosure of the FST source code.**

There is a clear public interest in disclosure of the FST source code, which has been used to generate evidence for use in thousands of criminal cases. Defense attorneys report that, when confronted with "unfavorable FST results," most defendants plead guilty. Kirchner, Bloch-Wehba Decl. Ex. E. State courts have split regarding whether the FST methodology meets the standard of being accepted in the relevant scientific community. *Compare Collins*, 49 Misc. 3d at 621, (holding that "the FST is not generally accepted in the DNA scientific community"), *with People v. Megnath*, 27 Misc. 3d 405, 411 (Sup. Ct. N.Y. County 2010) (finding that "LCN DNA testing as performed by the New York City OCME, is generally accepted as reliable in the forensic scientific community . . .").

The controversy surrounding the FST, and its use by the OCME, illustrates precisely why this is a matter in which "the public has a[n] [. . .] interest in, and thus the claim of access to the conduct of public business by a governmental agency." *City of Hartford*, 733 F. Supp. at 536 n. 5, *rev'd on other grounds*, 942 F.2d 130 (2d Cir. 1991). In *Collins*, a slew of eminent expert witnesses openly criticized the accuracy of the FST, arguing that the software leads to unacceptably high rates of false positives. The defense witnesses included Dr. Bruce Budowle— "the father of American DNA analysis" and a sixteen-year veteran of the FBI laboratory—who concluded that the FST's analysis of small DNA samples was unreliable. *Collins*, 49 Misc. 3d at 608–10. Former state and city employees, including Dr. Eli Shapiro, OCME's former Director of Training, and Dr. Ranajit Chakraborty, who had served on the New York State DNA subcommittee that had approved the FST, have also critiqued the FST. *Id.* at 608–12, 616.

The expert report submitted in connection with this matter only intensifies the public interest in understanding whether the FST functions as OCME claims. After examining the FST

source code, Nathaniel Adams, the expert witness for the defense, concluded that "the correctness of the behavior of the FST software should be seriously questioned." Declaration of Expert Witness Nathaniel Adams, Ex. C at 21, Dkt. 99. Portions of the Adams Declaration that supply more detail on the problems with the code are redacted and denied by court order to disinterested experts.

The public has a substantial interest in understanding the extensive, long-running disagreement among experts in the field about the reliability, accuracy, and fairness of the FST. But experts can only fully understand the program—and vet it for inaccuracies—by inspecting the source code to determine how it functions.  Even if the underlying forensic science were utterly uncontroversial, inspection of the code itself is essential to determine whether the program works as claimed. A mistake in the code can generate flawed results, even if it is based on sound theoretical foundations. However, without a serious independent review, such mistakes might linger suspected but unknown, hidden from the public, including to the people whose convictions may have been impacted.

Because of the controversy surrounding the FST, and the enormous impact on the criminal justice system, the public has a substantial interest in the program.  As a result of this public interest, the standard for modification of a protective order articulated in *Agent Orange* applies here.  OCME must therefore demonstrate good cause for continuance of the order, but has failed to do so.

### 2.    OCME would not be injured by disclosure of the code.

OCME cannot show a clearly defined, specific and serious injury that would flow from disclosure of the FST source code. The FST source code is not "proprietary" in the sense that OCME's economic interests would be jeopardized by disclosure. While the protection of proprietary information may merit a protective order in some instances, *In re Parmalat Sec.*

*Litig,*. 258 F.R.D. 236, 244 (S.D.N.Y. 2009), OCME, a government agency, has not met its burden to show that the "information sought is a trade secret or other confidential information, and that the harm caused by its disclosure outweighs the need of the party seeking disclosure." *Chembio Diagnostic Sys., Inc. v. Saliva Diagnostic Sys., Inc.*, 236 F.R.D. 129, 136 (E.D.N.Y. 2006) (citing *Bank of New York v. Meridien BIAO Bank Tanz., Ltd.*, 171 F.R.D. 135, 143 (S.D.N.Y. 1997)).

OCME does not claim that the FST source code is a trade secret. Nor can it. "[A] trade secret is 'any formula, pattern, device or compilation of information which is used in one's business, and which gives [the owner] an opportunity to obtain an advantage over competitors who do not know or use it.'" *North Atlantic Instruments, Inc. v. Haber*, 188 F.3d 38, 44 (2d Cir. 1999) (citing *Softel, Inc. v. Dragon Med. & Sci. Commc'ns, Inc.*, 118 F.3d 955, 968 (2d Cir. 1997)). OCME is a government agency engaged in forensic analysis, not a competitive commercial enterprise.

As this definition suggests, protection for proprietary information usually redounds to competitive, commercial entities—not governmental agencies or public laboratories.  Indeed, in its letter submissions, OCME identified no competitors at all.  Nor did OCME cite any authority as the basis for its assertion of a proprietary interest in the FST code.  Moreover, "non-trade secret but confidential business information is not entitled to the same level of protection from disclosure as trade secret information."  *Littlejohn v. Bic Corp.*, 851 F.2d 673, 685 (3d Cir. 1988).  "The party opposing disclosure must make a particular and specific demonstration of fact showing that disclosure would result in an injury sufficiently serious to warrant protection; broad allegations of harm unsubstantiated by specific examples or articulated reasoning fail to satisfy

the test." *In re Parmalat Sec. Litig.*, 258 F.R.D. at 244; *see also Grayson v. Gen. Elec. Co.*, No. 3:13CV1799 (WWE), 2017 WL 923907, at *1 (D. Conn. Mar. 7, 2017).[12]

While OCME raised the possibility that it might, someday, "cho[ose] to monetize" the FST source code, Dkt. 63, this vague conjecture is insufficient to establish that the code is either proprietary or confidential. OCME claimed that requiring the production of the FST source code could "deprive the City of property rights" and "impair the market for City materials"—a market that, they concede, does not exist. Dkt. 63.By its own admission, OCME currently neither sells the FST source code nor competes against commercial entities. OCME's alleged concerns are speculative, hypothetical, and insufficient to meet its burden.

OCME's claims fail to demonstrate that the FST source code is proprietary information, let alone that disclosure would damage its interests.  Indeed, in its original letter opposing this Court's subpoena, OCME invoked both the Copyright Act and the Defend Trade Secrets Act of 2016 in support of its assertion that it had a property right in the source code. Dkt. 63.  To the extent OCME has a property right at all, these statutes sufficiently protect its asserted proprietary interests in the FST source code, and, should the information be used improperly, ensure that OCME has ample avenues through which to seek a remedy. OCME's assertion that it may one day "monetize" the FST source code is not sufficient to overcome the public interest in disclosure.

Furthermore, by OCME's own admission, OCME no longer uses the FST source code. As of a September 2016 memo, OCME is set to retire the FST source code in favor of STRmix, a

---

[12] OCME's effort to avail itself of proprietary protections while operating in a non-commercial context is troubling.  *See* David S. Levine, *The People's Trade Secrets?* 18 Mich. Telecomm. & Tech. L. Rev. 61, 73 (2011) ("While trade secrecy theoretically might help taxpayers obtain the most cost-efficient government possible, other significant values in direct conflict with trade secrecy, like transparency and accountability, have even stronger moorings.").

commercially available software program. Kirchner, Bloch-Wehba Decl. Ex. E. OCME is

therefore unlikely to monetize the FST source code or use it in future endeavors, lessening its

asserted "advantage" over its unspecified competitors.

### C.      There Is No Sound Basis To Continue The Protective Order

Even assuming that good cause existed at the time the protective order was issued in July

2016, the extraordinary circumstances set forth above, and the compelling need of the public to

gain access to the source code for expert analysis, far outweighs the conclusory and speculative

harm that OCME alleged.

### 1.      OCME did not reasonably rely on the protective order.

When a party reasonably relies on a protective order a District Court generally should

refrain from modifying it, "absent a showing of improvidence in the grant of [the] order or some

extraordinary circumstance or compelling need,'" *TheStreet.Com*, 273 F.3d at 229 (quoting

*Martindell v. Int'l Tel. & Tel. Corp.*, 594 F.2d 291, 296 (2d Cir. 1979)).  There has been no such

reliance here.

Courts consider four factors to determine if a party reasonably relied upon a protective

order: "(1) the scope of the protective order; (2) the language of the order itself; (3) the level of

inquiry the court undertook before granting the order; and (4) the nature of reliance on the

order." *Nielsen Co. (U.S.), LLC v. Success Sys., Inc.*, 112 F. Supp. 3d 83, 120 (S.D.N.Y. 2015)

(quoting *In re EPDM Antitrust Litig.*, 255 F.R.D. 308, 313 (D. Conn. 2009)); *In re Sept. 11

Litig.*, 262 F.R.D. 274, 277 (S.D.N.Y. 2009). Even assuming that the protective order is

sufficiently "focused on a narrow set of materials" under the first factor, *Nielsen*, 112 F. Supp. 3d

at 120, the other three factors strongly indicate that OCME did not "reasonably rely" on the

protective order.

16

The plain language of the order establishes that it would have been unreasonable for OCME to rely on any assurance of confidentiality.  Protective orders are generally "construed according to general principles of contract law," requiring that "'deference is to be paid to the plain meaning of the language.'"  *City of Hartford*, 942 F.2d at 134 (quoting *Berger v. Heckler*, 771 F.2d 1556, 1568 (2d Cir. 1985)); *see also Geller v. Branic Int'l Realty Corp.*, 212 F.3d 734, 737–38 (2d Cir. 2000).  As the Second Circuit has noted, "protective orders that are on their face temporary or limited may not justify reliance by the parties.  Indeed, in such circumstances reliance may be *unreasonable.*" TheStreet.Com, 273 F.3d at 231 (emphasis added).

Under the protective order, this Court "retain[ed] unfettered discretion whether or not to afford confidential treatment to any Highly Confidential Material or designation of materials as Highly Confidential Material."  Dkt. 69 at ¶ 12.  "Where a protective order . . . anticipates the potential for modification . . . it is not reasonable for a party to rely on an assumption that it will never be modified."  *In re EPDM Antitrust Litig.*, 255 F.R.D. at 320 (citing *TheStreet.com*, 273 F.3d at 231).  This protective order plainly contained no "judicial assurance of confidentiality." *City of Hartford*, 942 F.2d at 136.  To the contrary, it explicitly recognized this Court's continued discretion to treat the allegedly "highly confidential material" as it saw fit.

Both the third and the fourth factors also weigh against finding that OCME reasonably relied on the protective order.  Protective orders granted on the basis of stipulation by the parties carry less weight than those granted after substantial court inquiry, such as a hearing to show good cause.  *Int'l Equity Invs., Inc. v. Opportunity Equity Partners Ltd.*, No. 05 CIV. 2745 (JGK)(RLE), 2010 WL 779314, at *6 (S.D.N.Y. Mar. 2, 2010) (citing *In re EPDM Antitrust Litig.*, 255 F.R.D. at 321; *Fournier v. Erickson*, 242 F. Supp. 2d 318, 341 (S.D.N.Y. 2003)). The Court issued the protective order here only after both parties agreed to it, and did not hold a good

cause hearing. This lack of extensive review "diminishes the degree of reliance the parties could place on the Protective Order not being modified." *Nielsen*, 112 F. Supp. 3d at 121.

Assessing the "nature" of the OCME's reliance on the protective order also shows that any such reliance was unreasonable.  When materials subject to a protective order are "the types of materials that the parties would have been obligated to produce in discovery, even in the absence of a protective order," the reliance interest is minimal. *Id.*  Here, the Court granted the subpoena compelling OCME to produce the FST source code long before it so-ordered the protective order.  When presented with the stipulated confidentiality provision, the Court even "question[ed] why a public laboratory would need a protective order in this context." Dkt. 57.

The OCME did not reasonably rely on the protective order, and this Court may thus "properly permit modification of the order." *TheStreet.Com*, 273 F.3d at 231. Whether to do so "is a decision committed to the sound discretion of the trial court.'" *Id*. (quoting *In re Agent Orange Prod. Liab. Litig.*, 821 F.2d at 147).

> **2.     There is both a compelling need and extraordinary circumstances requiring disclosure of the FST source code.**

As previously noted, the disclosure of the FST source code is a matter of substantial public interest, given its repeated use in over a thousand criminal investigations and the serious concerns about its reliability from experts in the field. OCME's continued use of the FST source code, despite the concerns that have repeatedly been raised about its reliability, have merely heightened the substantial public interest in knowing what the government is doing.

While this public interest is particularly pronounced in the context of the FST, it is not limited to the problems at OCME. Earlier this year, an Austin DNA lab made headlines under allegations of fraud and incompetence. With a record of problems extending back nearly a decade, authorities closed the lab, estimating remediation would take two years and $14

18

million.[13]  A program similar to FST, TrueAllele, has been under fire for several years for similar

reasons: a black-box program, difficult to review, and hiding beneath the smokescreen of

commercial interest while producing evidence leading to convictions. Gabrielson, Bloch-Wehba

Decl. Ex. B.  Journalists and scholars have reported that new technologies pose a heightened risk

of inaccuracies, especially in the context of unreliable crime labs and uncertain science. *See, e.g.*,

Shaer, Bloch-Wehba Decl. Ex. G; Erin E. Murphy, *Inside the Cell: The Dark Side of Forensic*

*DNA* (2015).

The interests at stake here are profound. Disclosure of the FST source code is the only

way that experts can vet the program in order to establish whether it functions as claimed.  This

inquiry is essential not only to resolving the persistent controversies raised by multiple experts in

the field—including the defense expert in this case, the defense witnesses in *Collins*, and Dr.

Stajic, to name a few—but also to establishing whether these uncertainties did, in fact, lead to

false positives, wrong outcomes, and convictions of innocent people.  This compelling need and

these extraordinary circumstances require disclosure of the FST source code to ProPublica and

the scientific community.

## III.   THE REDACTED PORTIONS OF NATHANIEL
## <u>ADAMS' DECLARATION SHOULD BE UNSEALED</u>

As this Court has already recognized, the public has a qualified constitutional right of

access to the sealed portions of the Nathaniel Adams Declaration.  *See* Dkt. 80 (citing *Lugosch v.*

*Pyramid Co. of Onondaga*, 435 F.3d 110, 119–20 (2d Cir. 2006)).  The Adams Declaration was

submitted as Exhibit C to the defendant's motion in limine, Dkt. 99, and bears a close connection

---

[13] Eric Dexheimer, *Austin Crime Lab Bucked DNA Standard For Years, Yet Got Passing Grades*,
Austin-American Statesman (Jan. 12, 2017), http://www.mystatesman.com/news/crime--
law/austin-crime-lab-bucked-dna-standard-for-years-yet-got-passing-
grades/MZBboOfzXWWgqlem6867TO/, *annexed as* Ex. L to Bloch-Wehba Decl.

to Mr. Johnson's substantive rights.  *See Lugosch*, 435 F.3d at 121 ("[W]here documents are

used to determine litigants' substantive legal rights, a strong presumption of access attaches.");

*see also United States v. Amodeo*, 71 F.3d 1044, 1050 (2d Cir. 1995) (contrasting the low

presumption of access that accompanies material exchanged in discovery with the heightened

presumption afforded to "a motion filed by a party seeking action by the court . . . [or] . . . any

other document which is presented to the court to invoke its powers or affect its decisions.").

Because the Adams Declaration is indisputably a judicial document to which a

constitutional right of access attaches, "the presumption of openness cannot easily be overcome."

*ABC, Inc. v. Stewart*, 360 F.3d 90, 98 (2d Cir. 2004).  The First Amendment requires that

"sealing of the documents may be justified only with specific, on-the-record findings that sealing

is necessary to preserve higher values and only if the sealing order is narrowly tailored to achieve

that aim." *Lugosch*, 435 F.3d at 124 (citing *New York Times Co. v. Biaggi*, 828 F.2d 110, 116 (2d

Cir. 1987)).  Nor does the existence of a confidentiality order establish that sealing of judicial

documents is reasonable.  *Id.* at 126.

For the same reasons that the protective order is not based on good cause, it cannot

satisfy the even more demanding First Amendment standard.  OCME cannot demonstrate that

there is a "substantial probability" that disclosure would harm a compelling government interest,

necessitating secrecy for the redacted portions of the Declaration.  *Press-Enter. Co. v. Superior

Court*, 478 U.S. 1, 14–15 (1986).  The Declaration should be released in unredacted form.

## IV.   PROPUBLICA HAS A FIRST AMENDMENT RIGHT TO RECEIVE THE FST SOURCE CODE

### A.   ProPublica Has Standing to Challenge the Order

The Second Circuit has found that "First Amendment protection for recipients of speech

extends to a wide variety of contexts."  *In re Application of Dow Jones & Co., Inc.*, 842 F.2d

20

603, 607 (2d Cir. 1988) (citations omitted). Under *Dow Jones*, an individual has standing to intervene if he is "actually [a] potential receiver[] of otherwise restrained speech." *Id.* This is so even if the willing speaker has not challenged the restraint himself. *Id.* ("It is hard, in fact, to imagine that there are no willing speakers.  Without them there would be no need for a restraining order; it would be superfluous.").

The test is plainly satisfied here. Christopher Flood, defense counsel for Mr. Johnson, received copies of the FST source code. A protective order prevents Mr. Flood from disclosing the FST source code to persons not party to the action. Dkt 68. Were it not for the continued imposition of confidentiality requirements in this matter, Mr. Flood has stated, he would disclose the FST source code, a matter of significant public interest, to ProPublica. Therefore, ProPublica has standing to intervene to challenge this protective order.

### B.    The Protective Order Restricts ProPublica's First Amendment Right To Receive Information

Mr. Flood and Mr. Adams both received copies of the FST source code through the criminal discovery process, but the protective order prevents either of them from disclosing it to ProPublica or any other person not party to the action. Dkt. 68. Mr. Flood has stated that he is willing to disclose the FST source code, a matter of substantial public interest, to ProPublica if the protective order were lifted or modified to allow him to do so.

Because there is no good cause underlying the protective order, the restraint on Mr. Flood's speech violates the First Amendment.  The Supreme Court has made clear that "parties have general [F]irst [A]mendment freedoms with regard to information gained through discovery" and, "*absent a valid court order to the contrary*, they are entitled to disseminate the information as they see fit." *Public Citizen v. Liggett Grp., Inc.*, 858 F.2d 775, 780 (1st Cir. 1988) (citing *Seattle Times Co. v. Rhinehart*, 467 U.S. 20,  31–36 (1984)) (emphasis added).

21

*Rhinehart* held that "where . . . a protective order is entered *on a showing of good cause* as required by Rule 26(c), is limited to the context of pretrial civil discovery, and does not restrict the dissemination of the information if gained from other sources, it does not offend the First Amendment." 467 U.S. at 37 (emphasis added). *Rhinehart* thus "established that First Amendment scrutiny of protective orders 'must be made within the framework of Rule 26(c)'s requirement of good cause,'" *Public Citizen*, 858 F.2d at 788 (citing *Anderson v. Cryovac, Inc.*, 805 F.2d 1, 7 (1st Cir. 1986)). Absent good cause, protective orders may raise First Amendment concerns.

As discussed above, no good cause exists for the protective order in this case. As a result, the limited exception to First Amendment doctrine recognized in *Rhinehart* does not apply. This protective order is simply an unlawful restraint on Mr. Flood's speech; it violates his First Amendment rights as a willing speaker and ProPublica's First Amendment right to receive information. *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976).

"An order that prohibits the utterance or publication of particular information or commentary imposes a 'prior restraint' on speech." *United States v. Salameh*, 992 F.2d 445, 446 (2d Cir. 1993). Prior restraints are subject to a "heavy presumption against [their] constitutional validity." *Id.* at 447 (citing *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 570 (1976)). Restraint on willing speakers can be imposed only where "the evil that would result from the reportage is both great and certain and cannot be mitigated by less intrusive measures." *CBS Inc. v. Davis*, 510 U.S. 1315, 1317 (1994) (citations omitted). Here, OCME's asserted proprietary interests fall far short of the "great and certain" harm that the First Amendment requires to justify an order preventing Mr. Flood from making specific statements and disclosing specific information.

## V.   THIS COURT SHOULD STAY THE REQUIREMENT THAT DEFENSE COUNSEL RETURN THE SOURCE CODE BY OCTOBER 12, 2017

ProPublica respectfully requests that this Court exercise its discretion to stay the requirement that defense counsel and retained experts return the FST source code pending resolution of this motion.  This Court's discretion to stay the protective order's return requirement "is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254–55 (1936); *Clinton v. Jones*, 520 U.S. 681, 706 (1997) ("The District Court has broad discretion to stay proceedings as an incident to its power to control its own docket.").  "The propriety of [a stay's] issue is dependent upon the circumstances of the particular case."  *Scripps-Howard Radio v. F.C.C.*, 316 U.S. 4, 10–11 (1942) (quoting *Virginian Ry. v. United States*, 272 U.S. 658, 672 (1926)).

A stay is particularly warranted because ProPublica may lose the opportunity to obtain access to the FST source code in this action.  As a practical matter, if the FST source code is returned to OCME and no longer in the possession of parties to this litigation, ProPublica would no longer be able to obtain access to the information from a willing speaker, even if this Court later grants ProPublica's motion to intervene and vacate the protective order.

The issuance of a stay would preserve the status quo while ProPublica's application is pending.  *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).  As demonstrated above, the disclosure of the FST source code is a matter of great public interest. Issuing a stay would allow the Court to fully consider on its merits ProPublica's application to intervene, to lift the protective order, and to unseal the Adams Declaration.

23

## CONCLUSION

For the foregoing reasons, ProPublica respectfully asks the court to grant its application to intervene, vacate the protective order for lack of good cause, and unseal the affidavit of Nathaniel Adams.

In the alternative, ProPublica asks the Court to stay the order enjoining the parties from returning the FST source code to OCME.

Respectfully submitted,


MEDIA FREEDOM AND INFORMATION
ACCESS CLINIC[14]

By: ___/s/_David A. Schulz_____
        David A. Schulz
        321 W. 44th Street, Suite 1000
        New York, NY 10036
        (212) 850-6103

        Hannah Bloch-Wehba (application for
            admission *pro hac vice* forthcoming)
        P.O. Box 208215
        New Haven, CT 06520
        (203) 436-5824

*Counsel for Pro Publica, Inc.*

---

[14] This memorandum was prepared by lawyers and students in the Media Freedom and Information Access Clinic, a programof the Abrams Institute for Freedom of Expression at Yale Law School but does not represent the views of the institution, if any.